STATE v. INDUSTRIAL TOOL & DIE WORKS, INC.[1]

November 9, 1945.

Nos. 34,011, 34,012.

[1]Reported in 21 N. W. (2d) 31.

*William E. G. Watson* and *John Ott,* for appellant.

*J. A. A. Burnquist,* Attorney General, *K. D. Stalland,* Assistant Attorney General, and *George W. Olson,* for the State.

MATSON, JUSTICE.

Appeal from an order denying a new trial in each of two actions brought by the state to collect war risk contributions pursuant to Mason St. 1940 Supp. c. 23AA, as amended by L. 1941, c. 554, and by L. 1943, c. 650, known as the employment and security act. One action pertains to war risk contributions for the first two calendar quarters of 1943 and the other to such contributions for the third calendar quarter. Both actions, consolidated for trial and appeal, involve substantially the same issues.

On and for many years prior to November 26, 1940, Wright-De-Coster, Inc. was an employer subject to said employment and security act. On said date, the corporation by conditional sales contract sold to Harry R. Naftalin and J. A. Campbell its entire physical assets, including its machinery, fixtures, inventory, and manufacturing plant, but not including its accounts receivable, and thereby transferred to said purchasers, doing business as Twin City Tool & Die Works, its organization, business, payroll, and personnel.

On December 19, 1940, Harry R. Naftalin and J. A. Campbell, with Gordon Campbell joining for statutory qualification purposes, as sole incorporators, organized a Minnesota corporation known as the Industrial Tool & Die Works, Inc. On December 24, 1940, Naftalin and J. A. Campbell sold, assigned, and transferred all their right, title, and interest in and under their conditional sales contract of purchase with Wright-DeCoster, Inc. to the said corporation, the defendant herein.

As a result of the above transactions, the business of Wright-DeCoster, Inc. for the calendar year 1940 was operated by Wright-DeCoster, Inc. from January 1 to November 26, 1940; from November 26 until December 24, 1940 (a period of approximately four weeks), by Naftalin and J. A. Campbell, doing business as Twin City Tool & Die Works; and from December 24 until the close of 1940 (and likewise throughout the succeeding years to date) by the defendant, Industrial Tool & Die Works, Inc.

On January 7, 1941, according to defendant's corporate records, 40 percent of its corporate stock was issued to Harry R. Naftalin, 40 percent to J. A. Campbell (inclusive of certain qualifying shares issued to Gordon Campbell), and 20 percent to William E. G. Watson, who never appeared of record as one of the incorporators.

It should be noted that Harry R. Naftalin and J. A. Campbell, doing business as Twin City Tool & Die Works, anent the four-weeks period they operated said business so acquired from Wright-DeCoster, Inc., made no return or report whatever as an employer about to go into business to the Minnesota division of employment and security. Furthermore, no written articles of partnership

were executed. They did, however, file a certificate of trade name certifying that they were the two individuals operating a commercial business under the name and style of Twin City Tool & Die ·Works.

It is also to be noted that on January 16, 1941, defendant, Industrial Tool & Die Works, Inc., by H. R. Naftalin as vice president, filed its "Report to Determine Liability" with the division of employment and security and therein specifically certified that it had acquired its business on November 27, 1940, directly (and not from any intervening partnership or entity) from Wright-DeCoster, Inc. as its predecessor. Defendant's contribution report for the portion of the fourth quarter of 1940 from November 27 to December 31, 1940, dated January 29, 1941, specifically certifies Wright-DeCoster, Inc. as its predecessor. Another significant item is the "Employer's Notice of Termination of Business," dated November 26, 1940, executed by Wright-DeCoster, Inc., certifying that its business had on November 27, 1940, been sold and directly transferred to defendant, Industrial Tool & Die Works, Inc. The contribution report of Wright-DeCoster, Inc. for that portion of the fourth quarter of 1940 up to November 27 is of the same tenor.

It is to be noted that the conditional sales contract dated November 26, 1940, providing for the sale of the business by Wright-DeCoster, Inc. to Harry R. Naftalin and J. A. Campbell, expressly provides that Naftalin and Campbell *"may at their option organize a corporation for the purpose of conducting the business contemplated by them, and that upon so doing"* (italics supplied) *they may assign said contract, and all rights therein, to said corporation subject to the proviso, however, that they as individuals shall not be released from their contractual obligations.* The contract also provides that the phrase "successors to Wright-DeCoster, Inc." may be used by the purchasers for a period of two years in connection with the sale of articles thereto manufactured, but that the name Wright-DeCoster, Inc. ·shall not be used at any time in connection with the manufacture of munitions or armament. The

seller, on the other hand, covenants not to engage in any similar business for a period of three years.

Subsequent to all the foregoing, the state legislature enacted the war risk contributions act, namely, L. 1943, c. 650 (Mason St. 1944 Supp. § 4337-24E), constituting an amendment to the employment and security act. This act, approved April 24, 1943, provided that it should "take effect and be in force from and after its passage, unless otherwise specifically provided therein, * * *." The pertinent sections of said amendatory act follow:

"E (1) Any employer who subsequent to December 31, 1940, has become or becomes subject to Chapter 23AA, Mason's Minnesota Statutes, 1940 Supplement, as amended by Laws 1941, Chapter 554, and as amended by this act, whose total current payroll, as defined in this subsection, for any calendar quarter within the period beginning January 1, 1942, and ending June 30, 1945, exceeds $50,000 shall pay war risk contributions, and any other employer whose total current payroll, as defined in this subsection, for any calendar quarter within such period exceeds $50,000, which has increased 100% or more over and above his normal payroll for the corresponding calendar quarter in 1940, shall in addition to his normal contributions pay war risk contributions on that part of his current payroll over and above 200% of his normal payroll, for the first such calendar quarter or the quarter commencing January 1, 1943, whichever is later and for each calendar quarter thereafter to and including June 30, 1945.

"(2) As used in this subsection, 'normal contributions' means the contributions computed at a percentage rate on an employer's current payroll which he is required to pay under subsections B, C or D of this section.

"(3) 'War risk contributions' means the additional contributions required under this subsection at a rate equal to 3%.

"(4) 'Normal payroll' means an employer's payroll for any calendar quarter in the year 1940 with respect to wages paid for insured work which corresponds to the same calendar quarter in any year within the period beginning January 1, 1942, and ending

June 30, 1945. The term 'normal payroll' shall include the payroll of any organization, trade, or business of another employing unit acquired by the employer by purchase, consolidation, merger, liquidation, or other form of reorganization.

"(5) 'Current payroll' means any current quarterly payroll with respect to wages paid for insured work in any year within the period beginning January 1, 1942, and ending June 30, 1945."

On May 12, 1943, the division of employment and security, using the payroll of Wright-DeCoster, Inc. for the first calendar quarter of 1940 as the "normal" payroll of defendant, made its determination of liability of defendant for war risk contributions for the first quarter of 1943 and notified defendant thereof by letter dated May 15, 1943. On May 28, defendant by letter notified the division that it had been informed by its attorney that it was not subject to war risk contributions for the first three quarters of 1943, and that "we shall contest payment of same if necessary." By letter dated May 29, 1943, defendant's attorney set forth in detail defendant's contention that its predecessor was not Wright-DeCoster, Inc., but the partnership of Naftalin and Campbell, doing business as Twin City Tool & Die Works, and that therefore the payroll of Wright-DeCoster, Inc. for the first three quarters of 1940 was not the "normal" payroll of defendant as specified by the war risk contributions act, and that in fact there was therefore no comparable period in 1940 upon which to establish a "normal" payroll subjecting defendant to liability for war risk contributions for the first three quarters. This latter letter stated that defendant had been advised to "withhold payment of this war risk contribution" in the hope that a ruling from the attorney general would obviate "the necessity of causing either trouble or expense to the State in connection with a suit for declaratory judgment." It appears that representatives of the division of employment and security had investigated all transactions leading to the organization of defendant and the acquisition of its business and that they had been informed of defendant's contentions.

The state thereupon instituted the proceedings involved in this appeal. The trial court, after first finding that Naftalin and Campbell, doing business as Twin City Tool & Die Works, by purchase on conditional sales contract of the organization, trade, business, and substantially all the assets of Wright-DeCoster, Inc. became thereby an employer subject to the employment and security act, made further findings to the effect that defendant, having acquired by "assignment all the organization, trade, business and assets of said Wright-DeCoster, Incorporated, which had been so purchased by the said Naftalin and Campbell under said conditional sales contract, it, the said Industrial Tool & Die Works, Inc., became an employer subject to said Employment and Security Act." The court then determined that the payroll of Wright-DeCoster, Inc. for the first three quarters of 1940 amounted to the respective quarterly sums of $4,672.28, $5,022.91, and $4,866.68, and that the payroll of defendant (based primarily on war contracts) amounted for the same comparative quarterly periods in 1943 to the respective sums of $185,882.49, $174,155.10, and $204,552.20. The court then found that the payroll of Wright-DeCoster, Inc. for the first three calendar quarters of 1940 constituted, as provided by said § 4337-24E, the "normal" payroll of defendant, and ordered judgment against defendant in the respective sums of $5,296.14, $4,923.28, and $6,136.57 as war risk contributions for the first three calendar quarters of 1943, together with interest thereon as provided by law.

Defendant's assignment of errors raises substantially the following issues:

(1) Were the war risk contribution taxes fixed and imposed without notice to defendant and without giving defendant a right to be heard in violation of the due process clause of U. S. Const. Amendment XIV?

(2) Does the evidence, under the provisions of the employment and security act, as amended by the war risk contributions act, sustain a finding that the payroll of Wright-DeCoster, Inc. for the first three quarters of 1940 constituted the "normal" payroll of defendant for the first three quarters of 1943?

(3) Is the adoption and use, pursuant to the war risk contributions amendment, of the 1940 payroll of Wright-DeCoster, Inc. as the "normal payroll" of defendant in calculating 1943 war risk contributions in violation of due process of law as guaranteed by the Fourteenth Amendment?

(4) Is the war risk contributions act, enacted and approved as of April 24, 1943, unconstitutional insofar as its provisions apply and have been retroactively applied to the first calendar quarter of 1943?

■ Defendant is in no position to assert that it has been denied due process of law through the failure of the director of the division of employment and security to give defendant advance notice of the determination of the amounts of war risk contributions imposed. In the first place, the rate was definitely established by said § 4337-24E and could not be varied by any hearing. The application of the rate to the reports already filed by defendant was a mere matter of mathematical computation. Insofar, however, as the applicability of the war risk contributions act to defendant for the first three calendar quarters of 1943 is concerned, any and all right to a hearing thereon was waived by defendant by the terms of the hereinbefore-mentioned letters addressed to the division under the dates of May 28 and May 29, 1943. These two letters flatly denied all liability and asserted in effect that a suit would be necessary unless a ruling from the attorney general should favor defendant. Defendant's demand for freedom from liability or that it be afforded adjudication by suit made the holding of a hearing a useless formality.

■ Defendant's waiver, however, followed by suit, only served to transfer the issue from the administrative to the judicial forum, where defendant was given its day in court.

"* * * Due process of law is satisfied when an opportunity is afforded to invoke the equal protection of the law by judicial proceedings appropriate for the purpose and adequate to secure the end and object sought to be obtained." Zalk & Josephs Realty Co.

v. Stuyvesant Ins. Co. 191 Minn. 60, 68, 253 N. W. 8, 13; State v. Weyerhauser, 68 Minn. 353, 362, 71 N. W. 265, 267.

■ Defendant contends that the Wright-DeCoster, Inc. payroll for the first three quarters of 1940 is not the "normal" payroll of defendant for the corresponding periods of 1943. This contention is primarily based on the assumption that the partnership of Naftalin and Campbell, doing business as Twin City Tool & Die Works, and not Wright-DeCoster, Inc., is defendant's predecessor; therefore, because the partnership had no payroll for the first three quarters of 1940, defendant cannot and does not have a "normal" payroll for the corresponding three quarters of 1943 within the terms of the statute. This contention is based on allegations of fact and also on the interpretation of certain sections of the statute.

In direct contradiction to the representations of fact contained in defendant's own "Report to Determine Liability" and further in its "Contribution Report" for a portion of the fourth quarter of 1940, as well as in contradiction to the fact representations found in the "Notice of Termination of Business" executed by Wright-DeCoster, Inc., defendant alleges that it had no dealings directly or indirectly with Wright-DeCoster, Inc.; that it dealt only with the partnership as a separate entity; and that as such it acquired only the "organization, trade or business" of the partnership. Defendant placed in evidence the conditional sales contract to show that the sale was made by Wright-DeCoster, Inc. to Naftalin and Campbell as a partnership, and contended that, although Naftalin and Campbell were granted the option to organize a corporation and assign said contract to such corporation, nevertheless Naftalin and Campbell should remain individually liable thereon for faithful performance. It was pointed out that the contract involved no transfer of the corporate structure itself but only the physical assets of Wright-DeCoster, Inc. (except its accounts receivable) and its payroll and personnel organization as hereinbefore indicated. Naftalin testified that he and Campbell were in doubt as "to what was the most practical manner in which the business should be conducted," and that after the purchase "it was a matter

of several weeks before a final decision was reached to incorporate a company." In the meantime, they operated the Wright-DeCoster business as a partnership (although no written articles were adopted), opened a partnership bank account, used the partnership name on the stationery as successors to Wright-DeCoster, Inc., acquired a lease to the business situs, and finally, as a separate and independent entity, assigned the conditional sales contract to the newly organized corporation, consisting of stockholders other than themselves so as to preclude any identity of organization.

The factual evidence as a whole, though conflicting, reasonably sustains the court's finding that defendant acquired by "assignment all the organization, trade, business and assets of said Wright-DeCoster, Inc." within the meaning of the statute so as to constitute the 1940 payroll of Wright-DeCoster, Inc. the "normal" payroll of defendant. The history of the entire transaction indicates that the partnership in the final analysis was only a conduit for effecting a transfer from Wright-DeCoster, Inc. to defendant. In re Lance Lbr. Co. (3 Cir.) 237 F. 357. The conditional sales contract reveals that the intent of the seller and the purchasers was in the alternative from the very beginning, in that it was expressly recognized that Naftalin and Campbell did not know whether to operate as a partnership or as a corporation, and were therefore given the contractual right to incorporate. This double intent was held in abeyance and did not crystallize in favor of incorporation until the lapse of several weeks, according to Naftalin's testimony. In determining contractual intent by which the parties must abide, the choice of intent finally made must control in determining the legal and equitable consequences attendant upon the transaction. The fact that Naftalin and Campbell remained individually liable even after the assignment to the corporation is neither unusual nor significant. Common prudence on the part of the seller would require a provision of retention of individual liability in case of incorporation.[2] The operation of the partner-

2"Generally, * * * persons dealing with promoters are given the double security of the promoters in the first instance and the corporation when

ship for about four weeks until the corporation came into existence is not inconsistent with the conduit theory, in that nothing else could be done until a choice as to mode of operation had been made. As a matter of fact, the incorporators were the same individuals as the partners, with the exception of Gordon Campbell, who joined as an incorporator to satisfy statutory qualifications. Although the incorporation became effective on December 19, 1940, followed by an assignment of the Wright-DeCoster contract on December 24, no corporate stock was issued until January 7, 1941. Clearly, Naftalin and Campbell operated the corporation's business as if they were the only individuals concerned and as if the corporation were merely a projection of the partnership. William E. G. Watson appeared as a 20-percent stockholder on January 7, but there is nothing to indicate that he had an interest in either the partnership or the corporation prior to that date. In further corroboration, we have the absence of written articles of copartnership and the failure of the partnership to file a return or report with the division of employment and security as an employer for the four weeks of business operation, and there is also the report made by Wright-DeCoster, Inc. of sale to defendant, and the two initial reports made by defendant itself.

'. ■ The technical objections that defendant could not act as a statutory employer during the four weeks of partnership operation, a period when the corporation was not even in existence, requires no consideration. Defendant, in view of its reports to the division of employment and security representing and certifying that it was a corporation and a subject employer from the time of the sale of Wright-DeCoster, Inc. and that Wright-DeCoster, Inc. was its immediate predecessor, is now estopped to deny the representations so made. Clearly, the director of employment and security had a right to accept and act upon defendant's representations as true in discharging his official duties. It is now too late for defendant to complain. State v. Citizens State Bank, 171 Minn.

it comes into existence and assents to the contract." Ballantine, Manual Corp. Law and Practice, § 47a.

29, 213 N. W. 45. Defendant's reports were filed with the director for the purpose of furnishing data upon which the normal rate of contributions could be fixed. In the making of these and similar reports, the taxpayer must reasonably envisage the possibility, if not the likelihood, of amendatory legislation changing the rates of assessment. This is especially true where the legislature has provided as herein that there shall be "no vested private right of any kind against such amendment or repeal." Minn. St. 1941, § 268.22 (Mason St. 1941 Supp. § 4337-39); Eldred v. Division of Employment and Security, 209 Minn. 58, 295 N. W. 412. The war risk contributions act was but an amendment increasing the rate of levy on certain employers to meet the increased hazards of wartime employment. See, State v. Donovan, 218 Minn. 606, 16 N. W. (2d) 897. From a factual standpoint, the issue of what constitutes the "normal" payroll of defendant might well be resolved in its entirety against defendant on the principle of estoppel.

■ The attempt to engraft § 4337-24H upon the war risk contributions act (otherwise known as Mason St. 1944 Supp. § 4337-24E) is without merit. The former section of this act was in effect before the latter and pertains only to the fixing of the normal contribution rate. The statutory rules of construction are helpful in determining the intent of the legislature. Minn. St. 1941, §§ 645.16, 645.17 (Mason St. 1941 Supp. §§ 10933-17, 10933-18). If we keep in mind "the occasion and necessity for the law," "the circumstances under which it was enacted," the contemplated "mischief to be remedied," "the object to be attained" (State v. Donovan, 218 Minn. 606, 16 N. W. [2d] 897), and "the consequences of a particular interpretation," it becomes clear that it was not the intent of the legislature to limit the application of the term "normal payroll" to include only the payroll of an immediate predecessor in the limited class of cases where one business organization absorbs another and a substantial interest or control is retained in the successor organization by the owner or owners of the predecessor, as would result if § 4337-24E(4) were to be limited by the terms of § 4337-24H. The interpretation sought by defendant in the instant

case would bring about an absurd and unreasonable result and limit the application of the act to a very narrow field not at all consistent with the objectives to be attained. We find nothing here to justify a construction contrary to the presumption that the legislature did "not intend a result that is absurd, impossible of execution, or unreasonable." § 645.17 (§ 10933-18), *supra*.

■ Mason St. 1944 Supp. § 4337-24E(4) contains the provision that "the term 'normal payroll' shall include the payroll of any organization, trade, or business of another employing unit acquired by the employer by purchase, consolidation, merger, liquidation, or other form or reorganization." Since the words *organization, trade, or business* are in the singular and since the sentence concludes with the words "or other form of reorganization," defendant seeks further to limit the application of the act to those cases involving the payroll of a single organization, trade, or business (constituting an employing unit) acquired by purchase, consolidation, merger, or liquidation as part of a process of reorganization whereby the predecessor employer and the successor employer become united as a single entity. The intent of the legislature is too clear to warrant such narrow interpretation, and this becomes increasingly apparent when we apply the statutory rules of construction. Obviously, the legislature was seeking a remedy broad enough to meet substantially all the potentially abnormal strains upon the employment fund likely to result upon the cessation of wartime employment. It is elementary that remedial statutes must be liberally construed for the purpose of accomplishing their objects. California Employment Stabilization Comm. v. Lewis, — Cal. —, 157 P. (2d) 38; Godsol v. Unemployment Comp. Comm. 302 Mich. 652, 5 N. W. (2d) 519, 142 A. L. R. 910. There is nothing to indicate that the legislature was seeking a capriciously narrow solution burdensome only to a few wartime industries. There is, however, much to indicate the contrary. It is to be assumed that the use of words in the singular, incorporated in the above provision, are in deliberate recognition of the fact that our existing statutory canons of construction specifically provide that "the singular in-

cludes the plural; and the plural, the singular." Minn. St. 1941, § 645.08(2), (Mason St. 1941 Supp. § 10933-9[2]). Any other interpretation would be unreasonable in the light of the object to be attained. The use of the word "any" is also significant. Obviously, the legislature was referring to the payroll of any organization or organizations, trade or trades, business or businesses, and it was immaterial that the "normal payroll" might be acquired as a result of more than one transfer or sale. Likewise, we cannot adopt the narrow interpretation that a purchase of an organization, trade, or business, as used herein, is necessarily confined to a reorganization. It is apparent that the legislature was referring to any purchase resulting in the acquirement of an organization, trade, or business without regard to whether a reorganization was involved at all. The manifest intent of the legislature, in the light of the objectives to be attained, was that the acquirement of an organization, trade, or business might be by purchase and, in addition, by any form of reorganization. § 645.08 (§ 10933-9), *supra*. "It is true, the language of a statute is to be construed in accordance with the rules of grammar whenever possible. This rule does not prevail, however, if such construction is contrary to the obvious intention of the legislature." Mattson v. Flynn, 216 Minn. 354, 359, 13 N. W. (2d) 11, 14; 6 Dunnell, Dig. § 8972; County of Sibley v. Village of Gibbon, 115 Minn. 56, 131 N. W. 786; State v. Minneapolis Milk Co. 124 Minn. 34, 144 N. W. 417, 51 L.R.A.(N.S.) 244.

■ Defendant contends that the adoption of the 1940 payroll of Wright-DeCoster, Inc. as the "normal payroll" of defendant in calculating war risk contributions for 1943 constitutes a denial of due process of law under the Fourteenth Amendment. It should be noted that—

"Subsection E(1) [§ 4337-24E(1)] of the statute classifies employers. Those employers whose current payrolls for the period between January 1, 1942, and June 30, 1945, are less than $50,000 per quarter are not subject to the war risk contribution provision of the statute. Those whose payrolls exceed $50,000 per quarter are

divided into three classes: (1) Employers who became subject to the state employment and security act after December 31, 1940, are subject to the tax on their entire payroll; (2) employers who were subject to the act prior to January 1, 1941, but whose payroll in any calendar quarter between January 1, 1942, and June 30, 1945, has increased 100 percent or more over and above their normal payroll for the corresponding calendar quarter in 1940, are subject to the tax on that part of their payrolls in excess of 200 percent of the normal payroll; (3) employers whose payroll exceeds $50,000 per quarter other than those in groups (1) and (2) pay no war risk contribution tax." State v. Donovan, 218 Minn. 606, 608, 16 N. W. (2d) 897, 898.

In the Donovan case, this court found the foregoing classification to be reasonable and not arbitrary and held the act not to be unconstitutional "as violative of the provisions of the federal and state constitutions affording to all persons the equal protection of the laws and requiring that taxes be uniform upon the same class of subjects." Here, defendant alleges the act to be contrary to due process of law as guaranteed by the Fourteenth Amendment, "in that it seeks to measure the defendant's liability for war risk contribution taxes for the first, second and third calendar quarters for the year 1943, by the payrolls of Wright-DeCoster, Inc., for the first, second and third calendar quarters for the year 1940," or, in short, that the act seeks to measure the tax on one person's property by reference to the property of another. Obviously, defendant is in error. The reference to the 1940 payroll of Wright-DeCoster, Inc. is not made for the purpose of fixing the amount of defendant's contributions, but rather to measure the amount of credits to which it is entitled. Furthermore, defendant is not being assessed upon the property owned by Wright-DeCoster, Inc., but only upon the basis of the wages paid by defendant to its own employes after the ownership of Wright-DeCoster, Inc. had entirely terminated. The only thing that carried over was the *status* of Wright-DeCoster, Inc. as an employing unit, and this carry-over constitutes a benefit, not a burden. See, California Employment Stabilization Comm. v.

Lewis, — Cal. —, 157 P. (2d) 38. The "normal payroll" measure is one of beneficence, not of injury.

"* * * As has been often pointed out, one who seeks to set aside a state statute as repugnant to the Federal Constitution must show that he is within the class with respect to whom the act is unconstitutional, and that the alleged unconstitutional feature injures him." Mallinckrodt Chemical Works v. Missouri, 238 U. S. 41, 54, 35 S. Ct. 671, 674, 59 L. ed. 1192, 1197; Premier-Pabst Sales Co. v. Grosscup, 298 U. S. 226, 56 S. Ct. 754, 80 L. ed. 1155; Eldred v. Division of Employment and Security, 209 Minn. 58, 61, 295 N. W. 412, 414; 11 Am. Jur., Constitutional Law, § 111; People v. Perry, 212 Cal. 186, 298 P. 19, 76 A. L. R. 1331.

Finally, we have the contention that the war risk contributions act, which was approved by the governor and became effective April 24, 1943, is unconstitutional as violative of the due process clause of the federal and state constitutions insofar as its provisions have been retroactively applied to the first calendar quarter of 1943. Although the act did not go into effect until April 24, its terms specifically provided for retrospective application to payrolls commencing with the first day of the then current year. As to the first calendar quarter, the act is undoubtedly retroactive.

■ The words "retroactive" and "retrospective" are synonymous and are so used herein. American States W. S. Co. v. Johnson, 31 Cal. App. (2d) 606, 88 P. (2d) 770, 37 Wd. & Phr. (Perm. ed.) pp. 528 and 531; 16 C. J. S., Constitutional Law, § 414.

■ The contributions tax assessed against an employer under the employment and security act is not a direct tax on property, but is an excise tax or a tax on the right or privilege to employ labor. Steward Machine Co. v. Davis, 301 U. S. 548, 578, 57 S. Ct. 883, 887, 81 L. ed. 1279, 1286, 109 A. L. R. 1293, 1298; California Employment Stabilization Comm. v. Lewis, — Cal. —, 157 P. (2d) 38.

■ Our employment and security act is copied from a similar federal act. Therefore, where substantially the same provisions are involved, the interpretation adopted by the United States Su-

preme Court will be followed.   Christgau v. Woodlawn Cemetery Assn. 208 Minn. 263, 293 N. W. 619.

Although an income tax has been held to be a property tax, nevertheless it has so many unique features that in many ways it is *sui generis*.  Reed v. Bjornson, 191 Minn. 254, 253 N. W. 102.  See, 12 Minn. L. Rev. 683.  There are enough points of similarity between an income tax and the excise or privilege tax involved herein to warrant a comparison.  Income taxes take a toll, for the support of the general government, from the flow of income or revenue passing to the taxpayer within a prescribed period, a large share of which never finds permanent investment (see, Reed v. Bjornson, 191 Minn. 254, 253 N. W. 102) ; and, similarly, payroll taxes under the employment and security act take a toll, measured by the passage of wages from the employer to his employes, within a given time, in the form of employer's contributions, for the limited purpose of providing a fund under the police power to relieve employes from the hazards of unemployment.  One is a tax upon the flow of income; the other is a tax measured by the flow of wages.  Both are necessary to the discharge of important governmental functions. The levy of an income tax involves the taxing power, whereas the enactment of an employment and security act, and all taxes or contributions levied thereunder, result from an exercise of the police power.   Minn. St. 1941, § 268.03 (Mason St. 1940 Supp. § 4337-21) ; Howes Bros. Co. v. Unemployment Comp. Comm. 296 Mass. 275, 5 N. E. (2d) 720.  In the exercise of the police power, the legislature enjoys a substantially greater freedom of action from constitutional limitations than in the exercise of the taxing power, and consequently police power statutes are subject to a more liberal interpretation.   1 Dunnell, Dig. & Supp. § 1605, and cases cited; 11 Am. Jur., Constitutional Law, § 248; 16 C. J. S., *Id.* § 175. "The purpose of the unemployment compensation act is to relieve the distress of economic insecurity due to unemployment.  It was enacted in the interest of public welfare to provide for assistance to the unemployed and as such is entitled to a liberal interpretation." Godsol v. Unemployment Comp. Comm. 302 Mich. 652, 665,

5 N. W. (2d) 519, 524, 142 A. L. R. 910, 917; Zelney v. Murphy, 387 Ill. 492, 56 N. E. (2d) 754. The points of similarity between the two taxes are sufficient to indicate that the principles governing the income tax decisions should be given most favorable consideration in determining the constitutionality of the retroactive features of the war risk contributions act; and this is especially true in the face of the liberal interpretation to be applied to police power legislation.

At the outset, it should be noted that—

"* * * Our state constitution contains no provision specifically prohibiting retrospective laws that are neither ex post facto nor impair the obligation of contracts, and accordingly decisions holding that a specific constitutional prohibition of retrospective legislation prevents a legislature from taxing income received or accrued prior to the effective date of an income tax law are not in point." 18 Minn. L. Rev. 95. See, 2 Cooley, Taxation (4 ed.) § 522.

■ Secondly, it is to be observed that no vested right may be acquired as against amendatory legislation under the express terms of our original employment and security act, Ex. Sess. L. 1936, c. 2, § 19, Minn. St. 1941, § 268.22 (Mason St. 1941 Supp. § 4337-39), which provided:

"The legislature reserves the right to amend or repeal all or any part of this Act at any time; and *there shall be no vested private right of any kind against such amendment or repeal. All the rights, privileges, or immunities conferred by this Act or by acts done pursuant thereto shall exist subject to the power of the legislature to amend or repeal* this Act at any time." (Italics supplied.) See, Eldred v. Division of Employment and Security, 209 Minn. 58, 295 N. W. 412.

■ It is well settled that a tax with retroactive features is not necessarily in violation of the due process clauses. Milliken v. United States, 283 U. S. 15, 21, 51 S. Ct. 324, 326, 75 L. ed. 809, 814; Billings v. United States, 232 U. S. 261, 34 S. Ct. 421, 58 L. ed. 596; Welch v. Henry, 305 U. S. 134, 146, 59 S. Ct. 121, 125,

83 L. ed. 87, 93, 118 A. L. R. 1142, 1146.   The last-mentioned case involved a Wisconsin statute enacted in 1935 levying an income tax for emergency relief purposes on dividends received in 1933 from Wisconsin corporations.   Mr. Justice Stone, writer of the majority opinion, said:

"The objection chiefly urged to the taxing statute is that it is a denial of due process of law because in 1935 it imposed a tax on income received in 1933.   But a tax is not necessarily unconstitutional because retroactive.   Milliken v. United States, 283 U. S. 15, 21, 51 S. Ct. 324, 326, 75 L. ed. 809; and cases cited. *Taxation is neither a penalty imposed on the taxpayer nor a liability which he assumes by contract.   It is but a way of apportioning the cost of government among those who in some measure are privileged to enjoy its benefits and must bear its burdens.   Since no citizen enjoys immunity from that burden, its retroactive imposition does not necessarily infringe due process, and to challenge the present tax it is not enough to point out that the taxable event, the receipt of income, antedated the statute.*

"In the cases in which this Court has held invalid the taxation of gifts made and completely vested before the enactment of the taxing statute, decision was rested on the ground that the nature or amount of the tax could not reasonably have been anticipated by the taxpayer at the time of the particular voluntary act which the statute later made the taxable event.   Nichols v. Coolidge, 274 U. S. 531, 542, 47 S. Ct. 710, 713, 71 L. ed. 1184, 52 A. L. R. 1081; Untermyer v. Anderson, 276 U. S. 440, 445, 48 S. Ct. 353, 354, 72 L. ed. 645 (citing Blodgett v. Holden, 275 U. S. 142, 147, 276 U. S. 594, 48 S. Ct. 105, 106, 72 L. ed. 206); Coolidge v. Long, 282 U. S. 582, 51 S. Ct. 306, 75 L. ed. 562.   Since, in each of these cases, the donor might freely have chosen to give or not to give, the taxation, after the choice was made, of a gift which he might well have refrained from making had he anticipated the tax, was thought to be so arbitrary and oppressive as to be a denial of due process. *But there are other forms of taxation whose retroactive imposition cannot be said to be similarly offensive, because their incidence*

*is not on the voluntary act of the taxpayer.* And even a retroactive gift tax has been held valid where the donor was forewarned by the statute books of the possibility of such a levy, Milliken v. United States, supra. In each case it is necessary to consider the nature of the tax and the circumstances in which it is laid before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation.

"Property taxes and benefit assessments of real estate, retroactively applied, are not open to the objection successfully urged in the gift cases. See Wagner v. Baltimore, 239 U. S. 207, 36 S. Ct. 66, 60 L. ed. 230; Seattle v. Kelleher, 195 U. S. 351, 25 S. Ct. 44, 49 L. ed. 232; compare Citizens National Bank v. Kentucky, 217 U. S. 443, 454, 30 S. Ct. 532, 535, 54 L. ed. 832; Billings v. United States, 232 U. S. 261, 282, 34 S. Ct. 421, 424, 58 L. ed. 596. Similarly, a tax on the receipt of income is not comparable to a gift tax. * * *

"Assuming that a tax may attempt to reach events so far in the past as to render that objection valid, we think that no such case is presented here. For more than seventy-five years it has been the familiar legislative practice of Congress in the enactment of revenue laws to tax retroactively income or profits received during the year of the session in which the taxing statute is enacted, and in some instances during the year of the preceding session. * * * The contention that the retroactive application of the Revenue Acts is a denial of the due process guaranteed by the Fifth Amendment has been uniformly rejected." (Cases cited.) (Italics supplied.)

It is well settled "that an income tax which is given retroactive effect by the legislature cannot properly be assailed on constitutional grounds * * * *if it applies to prior but recent transactions.*" Welch v. Henry, 223 Wis. 319, 326, 271 N. W. 68, 72, 109 A. L. R. 508 (reconsidered and affirmed in 226 Wis. 595, 277 N. W. 183). The Wisconsin supreme court in part summarized the "recent transactions" test by stating:

"It is our conclusion, (1) that under this rule the legislature may measure an income tax by the income of a year sufficiently recent so

that the income of that year may reasonably be supposed to have some bearing upon the present ability of the taxpayer to pay the tax; * * *."

The United States Supreme Court, in affirming the Wisconsin decision (Welch v. Henry, 305 U. S. 134, 150, 151, 59 S. Ct. 121, 127, 83 L. ed. 87, 95, 118 A. L. R. 1142, 1148, 1149), said:

"* * * And we think that the 'recent transactions' to which this Court has declared a tax law may be retroactively applied, Cooper v. United States, 280 U. S. 409, 411, 50 S. Ct. 164, 74 L. ed. 516, must be taken to include the receipt of income during the year of the legislative session preceding that of its enactment.

* * * * *

"While the Supreme Court of Wisconsin thought that the present tax might 'approach or reach the limit of permissible retroactivity,' we cannot say that it exceeds it." See, Brushaber v. U. P. R. Co. 240 U. S. 1, 36 S. Ct. 236, 60 L. ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713; Lynch v. Hornby, 247 U. S. 339, 38 S. Ct. 543, 62 L. ed. 1149; Cooper v. United States, 280 U. S. 409, 50 S. Ct. 164, 165, 74 L. ed. 516; International Harvester Co. v. Dept. of Taxation, 243 Wis. 198, 10 N. W. (2d) 169, affirmed, 322 U. S. 435, 64 S. Ct. 1060, 88 L. ed. 1373; American States W. S. Co. v. Johnson, 31 Cal. App. (2d) 606, 88 P. (2d) 770.

In the instant case, the war risk contributions act was applied retroactively only to the first quarter of the calendar year in which the law was enacted. Obviously, the contributions levy, though retroactive, was well within the "recent transactions" rule. We cannot say "that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation" of due process of law under either the federal or state constitutions. The incidence of the tax is not on the voluntary act of the taxpayer. The retroactive application of the statute is not to a business period too remote to have a reasonable relation to the present ability of the defendant to pay. After all, defendant is asked only to assume a proportionate share, with other employers similarly sit-

uated in his class, of the cost or burden of discharging the important governmental function of mitigating employment hazards resulting from a wartime economy. In the equitable sharing of this burden, we have no vested property or contractual rights of immunity arising merely from the fact that the tax-levy period antedates the statute.

It is immaterial that the employment and security act provides for reports and payments on a quarterly basis. Clearly, the calendar-quarter system has been adopted only for convenience in accounting and in making current collections. A perusal of the act as a whole, including, among others, specifically §§ 4337-221(1) and 4337-24F, quickly reveals that the calendar year is the normal and fundamental time unit of operation.

The income tax decisions are sufficiently analogous to be controlling in principle. We cannot agree with the decision of the Washington state supreme court, Bates v. McLeod, 11 Wash. (2d) 648, 120 P. (2d) 472, in its holding that an unemployment compensation act is unconstitutional insofar as contributory assessments are retroactively applied to a period in the same calendar year in which the act went into effect.

Aside from the income tax cases, other courts have held excise or privilege taxes constitutional though applied retroactively. In Garrett Freight Lines, Inc. v. State Tax Comm. 103 Utah 390, 135 P. (2d) 523, 146 A. L. R. 1003, an act imposing a retroactive tax upon users of Diesel motor fuel was held constitutional. In American States W. S. Co. v. Johnson, 31 Cal. App. (2d) 606, 88 P. (2d) 770, the corporate taxpayer had paid in full, under the original and existing statute, its annual corporate franchise tax (held to be an excise tax) for the year of 1935. After the payment of this tax on March 15, as required by law, the legislature in June 1935 amended the franchise tax statute by increasing the annual tax very substantially and by specifically providing that the statute, as amended, should be retroactive in its application to January 1, 1935. The California supreme court in holding the amendatory act constitutional specifically found that the taxpayer had been deprived of

no vested rights and had suffered no impairment of obligations of contract.

Affirmed.