**In the Matter of the GREATER MORRISON SANITARY LANDFILL, SW–15.**

**Nos. C6–88–1056, C4–88–1184.**

Court of Appeals of Minnesota.

Jan. 24, 1989.
Review Denied March 29, 1989.

Gerald W. Von Korff, Rinke–Noonan, St. Cloud, for relators City of Foley, et al.

Hubert H. Humphrey, III, Atty. Gen., Richard P. Cool, Sp. Asst. Atty. Gen., St. Paul, for respondent Minn. Pollution Control Agency.

Stanley J. Weinberger, Hall, Byers, Hanson, Steil & Weinberger, P.A., St. Cloud, for relators Town of Alberta, et al.

Timothy R. Thornton, Thomas A. Larson, Briggs & Morgan, Minneapolis, for respondent County of Morrison.

Heard, considered and decided by NORTON, P.J., and LESLIE and FLEMING, JJ.*

## OPINION

NORTON, Presiding Judge.

The two separate writs of certiorari issued in response to petitions by the cities of Foley, Gilman, Rice and Sauk Rapids (the cities), and by the towns of Alberta, Gillmanton, Graham, Granite Ledge, Langola, Mayhen Lake and Watab (the townships), have been consolidated into one action before this court. The cities and townships (collectively "relators") challenge a closure order issued by the Minnesota Pollution Control Agency (MPCA)˙ requiring relators and other entities to provide the necessary resources and funds to close a solid waste landfill site (landfill) located in Morrison County, Minnesota.

Relators' involvement in the landfill was as members of the Greater Morrison Sanitary Landfill Board (Landfill Board) which was formed by numerous local governments pursuant to the Joint Exercise of Powers Act, Minn.Stat. § 471.59, to operate the landfill. Relators argue that because they withdrew from membership on the Landfill Board during the 1970's, they should not now be held individually responsible for closing the landfill. They argue the statute authorizing the MPCA to close landfills, Minn.Stat. § 116.07,. subds. 4f, 4g (1986), should be construed to require only current owners and operators, not past owners and operators, to close a landfill. We affirm.

## FACTS

The material facts are not in dispute. In August, 1970, the City of Little Falls and the Towns of Belle Prairie, Green Prairie,

Little Falls and Pike Creek executed a joint powers agreement, thereby creating the Little Falls Community Sanitary Landfill Board. The purpose of the agreement was to create a joint board and to provide solid waste disposal facilities by the sanitary fill method.

The Landfill Board on August 19, 1970 entered into a contract with Bernard Westre, who with his wife owned real property in Morrison County, whereby the Landfill Board leased the property from the Westres and retained Bernard Westre as an independent contractor to operate a solid waste landfill on the property. After reviewing this arrangement, the MPCA issued permit SW–15 to the Landfill Board for construction and operation of a landfill located on the leased property.

A number of other nearby cities and towns soon joined the Landfill Board. In 1972, Morrison County promulgated and adopted its solid waste Management and Disposal Plan (Plan).

The Plan stated that the Landfill Board was made up of one representative from each governmental unit holding membership in the Landfill Board. The Plan indicated that the Landfill Board's responsibilities were to provide: (1) an approved MPCA landfill site for solid waste disposal; (2) a landfill operator; and (3) general oversight of the landfill operation to include operational and financial aspects. The Plan indicated that each governmental unit on the Landfill Board was a full participating member.

In the fall of 1973, the Landfill Board adopted amendments to the original joint powers agreement. The amendments included the establishment of a board of directors who were to govern the Landfill Board operations. The amendments also changed the name of the organization to "The Greater Morrison Sanitary Landfill Board."

The Landfill Board's bylaws provided that the business and affairs of the Landfill Board would be managed by a board of 17 directors, who must all be members of

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

the Landfill Board. During the Landfill Board's existence, a total of 43 governmental entities joined the Landfill Board (19 cities or villages; 23 townships; one county).

The landfill operated during the 1970's and 1980's, and waste from the geographic areas of various townships and cities was deposited into the landfill. At various times during the 1970's, each of the 11 relators withdrew from membership on the Landfill Board. Some withdrawals were written, some were oral. The facts do not indicate whether waste originating within the geographic limits of each of relators' boundaries was deposited in the landfill. For the purposes of this proceeding, the MPCA concedes that waste may not have originated from within all of the relators' geographic limits.

The MPCA renewed the Landfill Board's permits several times over the years. The last renewal was on December 20, 1984. This permit expired on March 28, 1986, and has not been renewed. After the expiration date, counsel for the Landfill Board informed the MPCA that the Landfill Board had decided to dissolve and assign its permit to the County of Morrison. Morrison County entered into an interim contract with the Landfill Board and Westre's Inc. (wholly owned by Bernard Westre and his brother, Raymond Westre) concerning operation of the landfill. The Landfill Board subsequently assigned its lessee's interest in the landfill property to Morrison County in September 1986. Morrison County later entered into several interim contracts with Westre's, Inc. The Landfill Board was not a party to these subsequent contracts.

During 1986 and into 1987, the MPCA on several occasions requested Morrison County to decide whether it would accept assignment from the Landfill Board of the permit to operate the landfill. Morrison County never agreed to accept assignment of the permit and on July 30, 1987, the MPCA requested the Landfill Board, the Westres and Westre's, Inc. to negotiate a closure

order by consent. When the parties were unable to come to agreement, the MPCA, on February 12, 1988, issued a public notice of the Commissioner's (of the MPCA) intent to request the MPCA to issue a closure order for the landfill. Fourteen parties[1] requested a contested case hearing prior to the MPCA's decision on whether to issue the closure order. The MPCA denied these requests, concluding that there were no material issues of fact and that holding a contested case hearing would not aid the MPCA in making a final decision. *See* Minn.R. 7000.1000, subpt. 3 (1987).

At an April 26, 1988 hearing, held solely to allow legal arguments, relators objected to their being included as responsible parties in the proposed closure order. They pointed out that they had all withdrawn from membership on the Landfill Board during the 1970's, and thus argued they were not members of the Landfill Board during any time during which they could incur responsibility for closure.

The MPCA disagreed and ruled that all governmental entities comprising the Landfill Board during its existence were responsible for closing the landfill, not just those entities which comprised the Landfill Board when the last permit expired or when the closure order was issued. The MPCA thus ordered the following entities to take the necessary actions to close the landfill site: Bernard and Mary Westre; Raymond Westre; Westre's, Inc.; the Landfill Board; and all 43 governmental entities which comprised the Landfill Board during the course of its existence.

The closure order requires, among other things, that the parties hire a professional consultant; provide for site security and safety; properly grade and cover the landfill; inspect the landfill periodically over a 20-year period; provide soil analysis; and provide financial assurance to the MPCA that the costs of implementing the order can be met. The closure order does not allocate liability or responsibility among the parties.

---

1. These were the seven townships and four cities who petitioned for certiorari, along with

Raymond Westre, Benton County and Morrison County.

The townships and cities separately petitioned this court for writs of certiorari. The writs issued and these cases were consolidated.

As of the April 26, 1988, the date of the closure order, the landfill had not been covered or graded; thus, waste remained uncovered and ground water had been contaminated by uncontrolled water run-off. No monitoring of the site, as required by the MPCA permit, has occurred since November 1986.

### ISSUES

1. Can governmental entities comprising the Landfill Board, which board was created pursuant to the Joint Exercise of Powers Act, Minn.Stat. § 471.59, be held individually liable for the actions of the Landfill Board?

2. Is the closing of a solid waste landfill facility the sole responsibility of the owners and operators at the time the facility is closed, or is it the responsibility of all owners and operators during the entire existence of the landfill?

### ANALYSIS

#### I.

■ The MPCA asserts that the Landfill Board acted as an agent of each individual governmental unit; therefore, each individual governmental unit remains responsible.

Relators reject the MPCA's agency analogy and argue that the Landfill Board should be analogized to either a corporation or a partnership: if a corporation, its members are like shareholders who cannot be held individually liable for corporate obligations; if a partnership, only its current members can be held individually liable for the current obligation to close the landfill. Under either analogy, relators assert, they cannot be held individually liable for closure.[2]

It is not clear whether a separate legal entity is created when governmental units act pursuant to the Joint Exercise of Powers Act, Minn.Stat. § 471.59. Neither is it clear, if an entity indeed is created, whether that entity has the attributes of a corporation or partnership, or is simply an agent acting on behalf of the principal member governmental units. *See generally,* Olson, *The Joint Exercise of Powers ... Interlocal Cooperative or Interlocal Confusion,* 42 Minnesota Bench and Bar, No. 7, pp. 25–30 (August 1985).

We believe that the entity, if any, created through the joint exercise of powers is in the nature of a hybrid, potentially possessing attributes of all the aforementioned legal relationships. The precise nature of any one such entity, however, must be determined on a case by case basis upon a thorough analysis of the purpose for and responsibilities of the entity.

In support of their corporate analogy, relators rely on Minn.Stat. § 471.59, subd. 11 (1986), which provides that when a joint powers board issues bonds or obligations, it cannot pledge the full faith and credit or taxing power of its members, and that any such bonds or obligations creating an indebtedness "shall be obligations of the joint board issued on behalf of the governmental units creating the joint board." Relators argue this provision implicitly recognizes that a joint powers board incurs its own liability to the exclusion of its members, and that all entities investing through or dealing with the board may look only to the board to satisfy obligations.

We find this analogy inappropriate. Persons purchasing bonds or obligations from a joint powers board understand they are taking a calculated risk when they invest in a specific project, and that there is no guaranty the project will be successful and yield any return on the investment. This is not

2. Arguing the townships raised this "separate entity" issue for the first time in their reply brief, the MPCA has moved to strike that portion of the townships' reply brief, or alternatively, for leave to file an additional respondent's brief. As relator cities had previously raised this issue in their first brief, and because the MPCA fully addressed the issue in its brief, we see no reason to prohibit the townships from arguing the issue or to allow the MPCA, as respondent, to file a second brief which simply reiterates the arguments in its first brief. Accordingly, the MPCA's motion is denied in all respects.

an investment situation. The MPCA, acting on behalf of the public, cannot be treated like an investor who risks not making a profit if the funded project is unsuccessful. Unlike the investor in bonds and obligations, the MPCA, i.e. the public, cannot risk its natural resources; therefore, it must be *guaranteed* the funds necessary to safely and properly close a landfill. Such a guaranty cannot be from a joint powers board, which may or may not be adequately funded; it must come from the full faith and credit of the member governmental units. Consequently, the joint powers board cannot be treated like a corporation in this situation.

We decline to determine whether the relationship between relators and the Landfill Board is more aptly characterized as one of principal-agent or partnership. Suffice to say, under either characterization, relators are not necessarily absolved of liability. If the Landfill Board is merely an agent, relators' liability, as principals, cannot be disputed. If there is a partnership, then relators are individually liable for all debts and obligations incurred prior to dissolution. *See United States v. Seppa*, 12 F.R.D. 251, 252 (D.Minn.1952) (construing Minn.Stat. § 323.25). In this case, dissolution would have occurred upon each of the relator's withdrawal from the Landfill Board. *See* Minn.Stat. § 323.28 (1986). Whether or not relators are individually liable, therefore, depends upon whether liability was incurred while the landfill was operating, or only upon termination of landfill operations. This question of when liability arises is addressed below.

## II.

Minn.Stat. § 116.07, subd. 4f (1986), provides:

> An operator or owner of a facility is responsible for closure of the facility and postclosure care relating to the facility. If an owner or operator has failed to provide the required closure or postclosure care of the facility the agency may take the actions. The owner or operator is liable for the costs of the required

closure and postclosure care taken by the agency.

Relators argue that only the operator or owner at the time of closing is responsible; the MPCA argues that all operators and owners during the life of the landfill are responsible. The statute is silent on this point. The few rules promulgated by the MPCA relating to closure responsibility are equally inconclusive. *See* Minn.R. 7035.-2500, subpt. 2 (1987) ("The person or persons * * * having the responsibility for the operation of the site must accomplish the closure of the site * * *.").

Matters of statutory construction constitute legal issues. *Matter of Welfare of M.J.M.*, 416 N.W.2d 142, 146 (Minn.Ct.App. 1987) (citing *Hibbing Education Association v. Public Employment Relations Board*, 369 N.W.2d 527, 529 (Minn.1985)). In reviewing issues of law, this court is not bound by the agency's decision and need not defer to the agency's expertise. *State by McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 854 n. 17 (Minn.1985) (citing *No Power Line, Inc. v. Minnesota Environmental Quality Council*, 262 N.W.2d 312, 320 (Minn.1977)). Thus, our review of whether the closure law applies only to current owners or operators is de novo.

■ Relators' argument is straightforward. They claim the statutory provisions relating to closure of landfills, enacted in 1984, *see* 1984 Minn.Laws ch. 644, § 49, and the Environmental Response and Liability Act (commonly known as the "Superfund Act"), enacted in 1983, *see* 1983 Minn. Laws ch. 121, should be construed together because the two laws are *in pari materia*. To support their assertion the laws are *in pari materia*, relators point out that both laws were designed to protect and preserve the natural environment by implementing methods of reducing damage caused by solid waste. Proceeding from the premise that the laws are *in pari materia*, relators point out distinctions between the two laws which, relators allege, prove the legislature intended only current operators of landfills be held responsible for closure.

The closure law sets forth the owner's obligations in the present tense, *see* Minn.

Stat. § 116.07, subd. 4f ("an operator or owner * * * *is* responsible for closure"), whereas the Superfund Act frequently uses the past tense. *See* Minn.Stat. § 115B.03, subd. 1(a)(1) (1986) ("a person is responsible * * * if the person *owned* or *operated* the facility when the hazardous substance * * * was placed or came to be located in or on the facility."). Relators amplify this point by correctly asserting that the Superfund Act goes into exhaustive detail as to the time when acts or omissions must have been committed for liability to arise. Indeed, the issue of liability for past acts and omissions gave rise to vigorous debate preceding the passage of the Superfund bill. *See* Williams, *A Legislative History of the Minnesota "Superfund" Act*, 10 Wm. Mitchell L.Rev. 851, 885 (1984). Relators thus argue that had the legislature intended past owners to be liable for closure, it would have inserted similar language into the closure law delineating what past acts or omissions give rise to liability.

Relators also point out that the Superfund Act details the apportionment of liability among responsible parties. *See* Minn.Stat. § 115B.08 (1986). In contrast, the closure law is silent as to apportionment of responsibility. Relators claim that the fact that no apportionment provisions were included, means the legislature did not anticipate multiple liability when a site is closed—something the legislature certainly would have anticipated had it expected to hold both past and present operators responsible.

We should begin by noting that, given the enormous liability an owner may incur under the closure law, it would have been appropriate for the legislature to more fully articulate the nature of this liability, both in terms of when it is incurred and how it should be allocated. In the absence of such legislative guidance, this court must rely on rules of statutory construction to glean the legislature's intent as to landfill closure liability. *See* Minn.Stat. § 645.16 (1986).

As noted above, relators' claim is premised on the proposition that the closure law

and Superfund Act are *in pari materia* and argue that, therefore, we should look to the Superfund Act in construing the closure law. *See* Minn.Stat. § 645.16(4), (5) (legislative intent may be ascertained by considering object to be attained and other laws upon same or similar subjects). We disagree with this proposition.

Statutes *in pari materia* are those relating to the same person or thing, or having a common purpose. *Apple Valley Red–E–Mix, Inc. v. State Department of Public Safety*, 352 N.W.2d 402, 404 (Minn.1984). The Superfund Act was designed primarily to impose and allocate liability for harm caused by hazardous substances; to authorize state clean up of contaminated sites; and to create a fund from which clean up costs could be paid. Williams, 10 Wm. Mitchell L.Rev. at 858. As the Superfund Act focuses specifically on hazardous chemicals, its primary impact is felt by industries which released or transported hazardous chemicals, or by the owners of the land upon which the chemicals were released.

Unlike the far-reaching Superfund Act, the closure law has relatively little impact on major industry, dealing solely with those in the business of owning or operating landfill sites. It does not deal with chemical polluters or transporters; it does not create any private cause of action, and it does not create a "superfund" for dealing with large scale hazardous waste clean up. Based on these major differences, we believe the two laws, enacted in different legislative sessions, are not *in pari materia* such that every word employed in one must be given the identical meaning as employed in the other. Therefore, we do not believe the closure law's use of the present tense necessarily implies that only those owning or operating a landfill at the time of closure are responsible for closing the site. Nor do we believe the legislature's failure to provide for allocation of liability forecloses the possibility of shared liability among present and past owners and operators.

We believe it is the legislature's intent to hold all past and present owners and opera-

tors responsible for closure, at least in such cases as here, where there was no MPCA–approved agreement limiting each relator's liability when it withdrew from the board.

■ The Minnesota Legislature has devoted an entire chapter to set forth the state's environmental policy. *See* Minn. Stat. ch. 116D (1986). This policy was first articulated in 1973, *see* 1973 Minn.Laws, ch. 412, about the same time relators became involved with the Landfill Board. Many of the policy statements are directly applicable to operation of solid waste landfills. For example, Minn.Stat. § 116D.02, subd. 2 (1986) provides, in part:

[I]t is the continuing responsibility of the state government to use all practicable means, consistent with other essential considerations of state policy, to improve and coordinate state plans, functions, programs and resources to the end that the state may:

(a) Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(b) Assure for all people of the state safe, healthful, productive, and aesthetically and culturally pleasing surroundings;

\* \* \* \* \* \*

(g) Define, designate, and protect environmentally sensitive areas;

\* \* \* \* \* \*

(k) Reduce wasteful practices which generate solid wastes;

\* \* \* \* \* \*

(m) Conserve natural resources and minimize environmental impact by encouraging extension of product lifetime, by reducing the number of unnecessary and wasteful materials practices, and by recycling materials to conserve both materials and energy;

\* \* \* \* \* \*

(s) Encourage advanced waste treatment in abating water pollution.

State agencies are directed that "to the fullest extent practicable" they shall interpret the policies, rules and public laws of the state in accordance with the broad environmental policy objectives of Chapter 116D. Minn.Stat. § 116D.03, subd. 1 (1986). Because it is designed to further the state's strong environmental policy, the closure law is remedial in nature; therefore, it should be liberally construed to effectuate the legislative intent to protect the environment. *See State v. Industrial Tool & Die Works, Inc.*, 220 Minn. 591, 604, 21 N.W.2d 31, 38 (1945); *See also* Minn.Stat. § 645.16(3), (4).

■ An unclosed landfill site poses serious environmental threats, such as groundwater contamination and the spread of disease, to name just two. It is thus imperative that a landfill is closed as quickly and thoroughly as possible. Obviously, the speed and thoroughness of closure is directly affected by the financial resources available to effectuate closure.

The MPCA is justifiably concerned that a "last one out is it" contest would occur if only the last landfill owner or operator were held financially responsible for closure. Owners would either abandon sites or structure transfers of the land to insolvent entities in order to avoid liability. Ultimately, landfill sites would lie unclosed because the sole entity legally responsible for closure would be financially incapable. Indeed, in this case the landfill is as yet unclosed and ground water contamination has been detected.

■ Even if the final owner or operator is not insolvent, the chances of a prompt and thorough closure are greatly increased if all entities involved during the landfill's existence share the responsibility. The importance of holding all entities responsible becomes evident when one considers that the cost of closure is potentially enormous. For instance, MPCA rules require those responsible for closure to "[p]rovide measures to protect underground and surface water." Minn.R. 7035.2500, subpt. 3(E) (1987). Given the interrelatedness of the state's underground and surface water systems, taking on closure responsibility may be nothing short of writing a blank check. Such substantial liability often cannot be borne solely by the final owner or operator. Consequently, we believe the legislature

intended that closure liability be incurred throughout the entire life of the landfill and, therefore, that all owners and operators share in the cost.

We should note that it is possible for the MPCA to require a current permit holder to enter into a binding agreement with a proposed permittee when a permit is transferred from one owner or operator to the next. *See* Minn.R. 7001.0190, subpt. 2 (1987). In such cases, it would be possible through an MPCA–approved agreement to provide that the current permittee would not be liable for a closure which occurs when a future permittee closes the landfill. Such is not the case here; relators unilaterally withdrew from the Landfill Board without any MPCA acknowledgment that they would be absolved of responsibility in sharing the cost of closing the landfill.

Aside from these policy considerations, we believe it would be fundamentally unfair, given the facts of this case, for relators to escape closure responsibility simply by withdrawing from membership prior to closure. By forming together with other governmental entities, they necessarily had to expect to incur some financial responsibility for the joint venture.

■ We also disagree with relators' claim that the 1984 closure law retroactively imposes liability upon them which they would not have incurred under the law in effect when they withdrew from membership. Given the history of this particular landfill, it is evident relators knew they could be held responsible for closure even before the 1984 law. As early as 1973, the MPCA, pursuant to then current regulations, *see* MPCA Reg. SW 6(2)(d)(i), 2(s) (1973), required the owners and operators perform ground water sampling and provide final cover material, both of which constitute final closure requirements under the current rules. *See* Minn.R. 7035.2500, subpt. 3(E), (G) (1987). Thus, in many respects, the current closure requirements parallel the day to day requirements for operating the landfill when relators were members of the Landfill Board. In addition, the amount of resources necessary to properly close a landfill is directly affected by how well the landfill was operated during its life. Thus, closure liability can properly be attributed to everyone who had some part in the landfill's operation.

We agree with relators that closure responsibilities under the current rules may be more extensive than those under the former MPCA regulations. *Compare* Minn.R. 7035.2500, subpt. 3 (1987) with MPCA Reg. SW 12 (1973). Nonetheless, relators could anticipate incurring some degree of closure responsibility when they became affiliated with the Landfill Board. The fact that liability may have been made more extensive through subsequent legislation and agency rulemaking does not justify totally absolving relators of their responsibility.

We should note that relators are in no way precluded from seeking, through district court action, proper indemnity and contribution from other entities affected by the MPCA's closure order. Through such action relators can achieve the fair allocation of liability which they claim the MPCA denied them. The MPCA, however, can only determine the parties responsible for closure and cannot, by itself, allocate liability in the absence of legislative authority. In turn, our review is limited to deciding whether the MPCA is correct in its determination. As discussed above, the MPCA correctly held relators are responsible for closure of the landfill.

### DECISION

The decision of the Minnesota Pollution Control Agency ordering relators and other entities to accomplish closure of the landfill site is affirmed in all respects.

AFFIRMED.