**STATE of Minnesota, Respondent (C1–02–372), Cross Appellant (C6–02–1064),**

v.

**Kent Richard JONES, Appellant (C1–02–372), Cross Respondent (C6–02–1064).**

Nos. C1–02–372, C6–02–1064.

Supreme Court of Minnesota.

March 11, 2004.

Rehearing Denied April 20, 2004.

Office of Minnesota State Public Defender, Ann McCaughan, Assistant State Public Defender, Minneapolis, Kent Richard Jones, Bayport, for Appellant.

Michael A. Hatch, State Attorney General, St. Paul, Kathleen A. Heaney, Sherburne County Attorney, Thomas C. McNinch, Assistant Sherburne County Attorney, Elk River, for Respondent.

## OPINION

PAUL H. ANDERSON, Justice.

A Sherburne County jury found Kent Richard Jones guilty of killing Linda Jensen. More specifically, the jury found Jones guilty of first-degree murder while committing criminal sexual conduct, second-degree intentional murder, and first-degree criminal sexual conduct. The district court entered a conviction against Jones on the first-degree murder count and sentenced him to life in prison. Jones appealed his conviction, through counsel, on the grounds that the court erred in (1) finding that there was probable cause to support a search warrant; (2) admitting DNA evidence; (3) finding that there was insufficient foundation for the introduction of Jones' alternative perpetrator evidence; and (4) requiring Jones to wear a leg restraint during trial. Jones also claimed there was prosecutorial misconduct during cross-examination and closing argument. Jones made an additional 11 arguments in a pro se brief.

Following Jones' conviction, the victim's sister petitioned for restitution for her lost wages and travel costs for attending the trial. The district court determined that it did not have jurisdiction to award restitution because the sister was not a victim within the meaning of the restitution statute. The state filed a notice of appeal to contest the restitution order and that appeal was consolidated with Jones' direct appeal. We reverse the conviction, but affirm the denial of restitution.

On the morning of Monday, February 24, 1992, Linda Jensen was at home with her infant daughter, Lisa. Charles Jensen, Linda's husband and Lisa's father, had left for work at about 6:45 and Linda's nine-year-old son Joseph left for school around 7:45. Charles called home three times that morning between 9:30 and noon, but his wife never answered or responded to the message he left. Charles returned home from work shortly after 4:00 p.m. and discovered his stepson Joseph sitting at the dining room table and Lisa crying in her playpen. He took Lisa out of the playpen and went to look for his wife in the master bedroom. Upon entering the bedroom, Charles first noticed that the bed had been stripped and eventually found his wife's naked body lying on the floor alongside the bed, covered by a comforter, with a knife protruding from her chest. He then called 911 to report that his wife was dead.

The Sherburne County Sheriff's department responded to the 911 call. The Bureau of Criminal Apprehension (BCA) was then contacted to assist in the investigation of the crime scene. Investigators found no signs of forced entry. Charles

Jensen eventually discovered that the queen-size fitted sheet for the bed was missing, as were a condom and his wife's T-shirt and underwear. Investigators gathered forensic evidence from the scene and canvassed the neighborhood. The local postal carrier was among the persons interviewed. The carrier stated that she had arrived at the Jensen home at about 11:30 a.m. that day and had observed a man driving out of the driveway. The carrier said the man was in his 30's or 40's, unkempt, with scraggly long brown hair and a white-flecked beard. She said he had acted strangely and was "crouched down" in his pickup truck. She also noticed that the man had what appeared to be red streaks "like scratch marks" on his hands. She noted her impressions of the man and later worked with investigators to create a composite sketch that was circulated through the media.

Linda Jensen's autopsy revealed that, in addition to the multiple stab wounds, there was evidence of strangulation and other abrasions and contusions. The cause of death was determined to be multiple traumatic injuries as a result of an assault. The time of death was determined to be between 8:00 and 10:00 a.m. The autopsy and BCA investigation also revealed that there were sperm cells present in Jensen's vaginal canal and some minimal amount of semen on her ankle. The BCA tested the DNA sample from the vaginal canal against about 80 other DNA samples, including many from potential suspects, but failed to find a match. Despite an ongoing investigation, investigators were unable to ascertain who committed the homicide.

In mid-June 2000, over eight years after Linda Jensen's death, Angela Hennen called the Sherburne County Sheriff's department and made statements connecting appellant Kent Richard Jones to Jensen. Jones and his family lived approximately one-half mile from the Jensens. Hennen stated that she and Jones had an affair before 1992 and were still in limited contact in 1992. She also stated that in March 1992 she had mentioned Jensen's murder and assault to Jones and he had become angry. Jones later admitted to Hennen that Jensen used to jog past his house and they had chatted on occasion. Based on this information, investigators questioned Jones, who had previously been interrogated during the initial investigation. In this second interview, Jones denied knowing Jensen, though he recalled that she had come to his house to discuss Cub Scout activities for her son. When asked if he had an affair with Jensen, Jones became angry. The investigators asked Jones to give a DNA sample, but he refused. The investigators then obtained a warrant based on their discussion with Hennen and their interviews with Jones. Upon presentation of the warrant, Jones provided swabbings for DNA testing.

After obtaining Jones' DNA sample, a BCA technician used the PCR–STR DNA testing method, amplified a sample taken from Linda Jensen's body, ran tests using the Cofiler and Profiler Plus kits, and concluded that the Jones sample and the smear from Jensen's body had the "same DNA types." Jones was then arrested and charged with Jensen's murder. A grand jury indicted Jones on August 16, 2000 for first-degree murder while committing criminal sexual conduct, Minn.Stat. § 609.185(2) (2000), second-degree intentional murder, Minn.Stat. § 609.19(1) (2000), and first-degree criminal sexual conduct, Minn.Stat. § 609.342, subd. 1(e)(i) (2000). This indictment was dismissed due to prosecutorial misconduct. A second indictment for the same offenses was issued on May 31, 2001. Jones moved to dismiss that indictment, but the motion was denied.

Jones later moved to suppress the DNA evidence seized under the warrant, and this motion was also denied. The district court determined there was sufficient probable cause to support the issuance of the warrant because there was evidence that Hennen was a credible informant and the totality of the circumstances supported a finding of probable cause.

Jones then requested a *Frye–Mack* hearing to challenge the admissibility of the DNA evidence, arguing the second prong of the *Frye–Mack* test, foundational reliability, could not be established.[1] After a four-day hearing, the district court found that the BCA "conducted the DNA tests * * * in accordance with appropriate laboratory standards and controls so as to ensure reliability." The court then concluded that Jones' arguments ultimately went to the weight and not to the admissibility of the evidence and found the DNA evidence to be sufficiently reliable to be admitted at trial.

Jones filed notice of his intent to present evidence of alternative perpetrators. He intended to introduce evidence that Robert Beard, Linda Jensen's former boyfriend and the biological father of her son Joseph, had a propensity for violence, had motive and opportunity to commit the murder, and resembled the sketch based on the postal carrier's description of the man she saw. Jones also intended to present evidence that Beard had warned a girlfriend that if she did not "behave," he would kill her as he had Linda Jensen and that he had described in detail how Linda Jensen was murdered and what the crime scene looked like.

In addition to the evidence about Beard, Jones intended to introduce evidence about another man, Richard Christy, who met Linda Jensen at an athletic club and was allegedly interested in her. Jones alleged that Christy had an opportunity to commit the crime. Jones claimed that Christy called a friend the day of the murder stating that he needed a ride and that he was "in deep shit" because he had "offed" somebody. Christy had allegedly been seen on the day of the murder with blood on his hands and jacket and had fled to Texas shortly after the murder, leaving behind many of his personal belongings. Most of the testimony offered to corroborate the evidence about Christy was to come from a man named Drahota, who claimed to have seen some of Christy's incriminating acts. Drahota also claimed to have spoken with the person Christy allegedly called on the day of the murder—a man named Chandler, who has since died.

The state opposed the admission of this alternative perpetrator evidence. To support its opposition, the state presented evidence that the investigators had considered both Beard and Christy as suspects, but a DNA sample from each was tested and neither sample matched the sample taken from the crime scene. After hearing from both sides, the district court ruled that the alternative perpetrator evidence would not be admissible at trial. The court found there was no direct evidence connecting either Beard or Christy to the scene and the corroborating evidence of Christy's potential guilt was inadmissible hearsay that lacked credibility.

1. Jones initially requested a hearing on each prong of the *Frye–Mack* test, but the district court limited its inquiry to "the so-called 'second prong' of the *Frye* test, that is, whether there was compliance by the testing laboratory with appropriate standards and controls and whether proper availability has been made of the testing data and results." The court declined to hear arguments on whether the PCR–STR testing method was generally accepted, agreeing with the state that the first prong was well established.

Jones' trial began in November 2001. Despite his objection, Jones was required to wear a leg restraint throughout the trial because the district court determined "that limited use of one restraint is reasonably necessary to maintain order and security, and * * * that is the least restrictive measure available to the court." The leg restraint was inserted under Jones' pant leg so that it was not visible. Apparently the jury was not made aware of the restraint. When Jones testified, he was not required to wear the leg restraint and, on all other days, he was seated before the jury entered and left the courtroom after the jury departed.

Jones testified in his defense and stated that he and Linda Jensen had been having an affair that began in October 1991. He explained the discovery of his DNA in Jensen's vaginal canal by claiming that on the afternoon before the murder, Jensen had come to his house and they had sex. He stated that during this sexual encounter, he used a condom, but it broke. Jones' theory of the case was that the murderer, probably either Beard or Christy, used the condom that was missing from the Jensens' bedroom and that is why only Jones' semen, deposited the afternoon before, was discovered in the body.

The state's case included the testimony of Charles Jensen, who testified about his relationship with his wife and finding her body. He also testified that he was home with his wife the entire day before she was murdered. On cross-examination, Charles Jensen acknowledged that while he was home with his wife for the entire day, they were not in each other's presence for the entire day. Linda Jensen's son Joseph, who was 19 years old at the time of the trial, testified about coming home on the day of the murder and not being able to locate his mother. He also testified that he knew Jones as the Cub Scout leader in the neighborhood. Investigators for the sheriff's department testified about their initial investigation, the discovery of the body, and the procedure followed for the removal of evidence to the BCA labs.

The medical examiner testified that, in his opinion, Linda Jensen was killed during the course of a sexual assault. He based this opinion on the level of acid phosphatase in her vaginal canal and the presence of sperm with intact tails at the time of the autopsy, which indicated she "had seminal fluid deposited in her body * * * at the time of her death." The examiner also testified that he could not rule out the possibility that the seminal fluid was deposited "possibly 12 hours, going back as far as 24 hours prior to the time that I believe she died."

The examiner stated that his belief that the sperm were deposited more closely to the time of death was supported not just by the acid phosphatase level, but also by the condition of the sperm recovered from the vaginal canal. The examiner said that, while sperm cells break down after being deposited in a live person, once the person dies, the breakdown slows considerably. The combination of those two factors led the examiner to state that the sexual assault and murder were simultaneous. But the examiner then qualified this statement by adding that "I think the earliest time [the sperm] could have been deposited making the assumption that I did to the police I think that she died shortly after 8:00 in the morning on the 24th, would be 8:00 on the 23rd."

A BCA technician testified that before the BCA was able to match the DNA obtained from Linda Jensen's body to the DNA sample taken from Jones, it unsuccessfully compared it with 80–85 other DNA samples. The technician testified that the statistical probability of a random

match with Jones' DNA under the "product rule" was one in 541 billion.

The state also called Hennen, who was the informant who provided some of the information that led to the issuance of the search warrant for a DNA sample from Jones. Hennen testified to the facts as stated in the search warrant affidavit. In addition, the state called Tammy Mace, a friend of Jones, who testified that she retrieved a bed from the Jones house on Sunday afternoon, the day before the murder, and was there for about one or two hours.

Lloyd Anderson also testified for the state. Anderson was an inmate at the Sherburne County jail who had been held in the same area as Jones. Anderson testified that he had heard Jones say DNA only lasts 72 hours, and that he could not believe he had been able to get to the Jensens' house and back again without his wife discovering he had left the house. Anderson also testified that when he asked Jones what happened, Jones testified that he had stabbed someone 9 to 11 times. Anderson reported Jones' statements to the police the next day. When the police questioned him about Jones' alleged statements, Anderson stated "if—I'll come back here and get stuck for five months I might have made this up." Anderson also called an acquaintance and told her that he wanted ed the government to "drop the conspiracy charge and give [him] 18 months" in exchange for his cooperation with the Jones case. Jones testified that he never told Anderson that he had killed Linda Jensen and had, in fact, written a letter to his parents stating that he did not trust Anderson and believed that Anderson was trying to elicit information about his case.

Jones' mother also testified about Jones' suspicion of Anderson.

Jones' wife testified that she had been unaware of her husband's infidelities before the trial. She also testified that she may have taken their children to a movie the afternoon before the murder, but she was home all day with her husband on the day of the murder. She testified that on that day, he had no cuts or bruises on his hands or any blood on his body or clothes.

Jones also called the postal carrier who had helped create the sketch of the man she had seen in the Jensens' driveway on the morning of the murder. The postal carrier testified that she knew Jones because she delivered mail in the neighborhood and the man she had seen in the driveway was not Jones. Additionally, Jones elicited testimony on cross-examination of the medical examiner that a short gray hair was found in Linda Jensen's pubic hair and it was determined not to have belonged to her.[2] Investigators never established where the hair had come from, but it was established that Jones did not have any gray hair on his head or body. The state introduced rebuttal testimony from Charles Jensen that in 1992 the hair on his head had started going gray, as had the hair in his mustache.

The jury found Jones guilty of all charges. The district court denied Jones' motions for a directed verdict and later for a judgment notwithstanding the verdict. The court convicted Jones on the first-degree murder count and sentenced him to life in prison. The court also ordered Jones to pay restitution "in an amount to be determined by court services." The court did not specify how much or to whom the restitution would be paid, but gave the

**2.** There was some discussion outside the presence of the jury about the gray hair, which was never tested. The court issued a cautionary instruction agreed to by both parties stating that the DNA testing method for testing the hair was unavailable and the hair was not tested for that reason.

state 60 days to provide an affidavit of restitution.

Following the trial, Sandra Halverson, Linda Jensen's sister, filed an affidavit of restitution listing $1,903.20 in lost wages and $441.25 in gas for travel to and from the courthouse during the trial, as well as unspecified lost wages due to emotional trauma. Jones filed a motion requesting a restitution hearing. He asserted that Halverson was not a victim within the meaning of the statute and that the claimed expenses were not out-of-pocket expenses resulting from the crime. The district court held a restitution hearing and denied restitution, finding that because Halverson was not a victim within the meaning of Minn.Stat. § 611A.01 (2002), she was not a person eligible to receive restitution, and therefore the court lacked jurisdiction to order restitution.

The state filed a notice of appeal to contest the denial of restitution. Jones, who had already filed a notice of appeal for his first-degree murder conviction, filed a motion to dismiss the state's appeal, or in the alternative, to consolidate the appeals. We consolidated the two appeals.

### I.

We first address whether the district court erred in affirming the issuing judge's determination that the search warrant was supported by probable cause. When reviewing a determination that there was probable cause for a search warrant, we are to ensure that the issuing judge had a substantial basis for concluding there was probable cause. *State v. Zanter*, 535 N.W.2d 624, 633 (Minn.1995). We afford great deference to the issuing judge's determination on probable cause. *State v. Rochefort*, 631 N.W.2d 802, 804 (Minn.2001). Minnesota uses a "totality of the circumstances" approach for these determinations; thus, a collection of pieces of

information that would not be substantial alone can combine to create sufficient probable cause. *State v. Harris*, 589 N.W.2d 782, 788 (Minn.1999); *Zanter*, 535 N.W.2d at 633.

We have recognized that "statements from citizen witnesses, as opposed to criminal informants, may be presumed to be credible." *Harris*, 589 N.W.2d at 789. This is especially true when it is a "first-time citizen informer * * * who is not involved in the criminal underworld and who has no track record as a police informant." *State v. Siegfried*, 274 N.W.2d 113, 115 (Minn.1978). But we have established that when an affiant's basis of knowledge or source of information is not personal observation, additional facts must be provided to assist the issuing judge in making an independent determination of the reliability of the information and the source. *State v. Pietraszewski*, 285 Minn. 212, 217, 172 N.W.2d 758, 762 (1969).

Jones argues that the affidavit offered in support of the warrant application did not provide a sufficient basis for finding probable cause largely because it relied inappropriately on information from Hennen, his former girlfriend, acting as a confidential informant. He also argues that not even minor details were supplied to lend credence to Hennen's credibility or the veracity of her information. *See State v. Ward*, 580 N.W.2d 67, 71 (Minn.App.1998). Such details, he argues, were especially important given that the conversation she relayed had occurred eight years earlier.

In contrast, the state argues that the first-time citizen informant rule applies, so reliability is presumed, and that Hennen's credibility was enhanced because she revealed her identity to the police. *See State v. Lindquist*, 295 Minn. 398, 400, 205 N.W.2d 333, 335 (1973) (stating that an informant who does not remain anonymous is more likely to be telling the truth be-

cause she could be arrested for making false statements). The state also argues that it was appropriate for the district court to be unconcerned with the eight-year delay between Hennen's conversation with Jones and her reporting it to the police. In support of this argument, the state noted that when Hennen spoke with the police in 2000, she had only recently heard a news report about the case, she was no longer in a relationship with Jones, and she had been remarried for approximately three years, so there was no indication of a revenge motivation or bias.

■ The district court agreed with the state, noting that Hennen gained the information under circumstances "consistent with a normal, non-suspicious discussion over a topic of immediate public concern between two people not involved in current criminal conduct," and her reliability as a citizen informant could therefore be presumed. The court also agreed with the issuing judge that the totality of the circumstances described in the warrant were sufficient to establish probable cause.[3] Jones had a history of extramarital affairs. He initially stated he did not know Linda Jensen, and he became angry and defensive when asked about the murder. He subsequently changed his attitude and admitted to having known Jensen. He also made inconsistent statements to investigators and Hennen and had a history of domestic assault complaints, including one under investigation at that time that involved puncture wounds consistent with those inflicted by a knife.

■ Jones also asserts that the affidavit supporting the warrant contains factual misrepresentations. Misrepresentations invalidate a warrant when they are (1) deliberately or recklessly made, and (2) material to establishing probable cause, meaning probable cause could likely not be established without them. *State v. Moore*, 438 N.W.2d 101, 105 (Minn.1989); *State v. Causey*, 257 N.W.2d 288, 291–92 (Minn. 1977).

3. It appears from the record that the district court did not base its decision to uphold the validity of the search warrant on Jones' refusal to voluntarily provide a DNA sample. We are, however, troubled by the inclusion of the following language in the affidavit submitted to the court in support of the request for a search warrant. The affidavit stated in part:

> Hundreds of people have been interviewed during the investigation. The officers have requested a DNA sample from over 80 interviewees to rule them out as suspects. Most interviewees have cooperated.
> * * * *
> * * * The officers asked Mr. Jones to provide a sample of DNA. His wife, Debra Marie Jones, encouraged him to provide a DNA sample but he refused.
> * * * *
> The only way Kent Richard Jones can be eliminated as a suspect is by providing a DNA sample.

A passive refusal to consent to a search cannot be treated as evidence of a crime. *See United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir.1978) (stating that "[o]ne cannot be penalized for asserting this right, regardless of one's motivation. Just as a criminal suspect may validly invoke his Fifth Amendment privilege in an effort to shield himself from liability, so may one withhold consent to a warrantless search, even though one's purpose be to conceal evidence of wrongdoing.") (citations omitted). Similarly, a defendant's refusal to consent to a search cannot establish probable cause upon which to obtain a warrant to conduct the search. *See United States v. Alexander*, 835 F.2d 1406, 1409 n. 3 (11th Cir.1988). "If the government could use such a refusal against the citizen, an unfair and impermissible burden would be placed upon the assertion of a constitutional right and future consents would not be 'freely and voluntarily given.'" *Prescott*, 581 F.2d at 1351 (citation omitted). Because under both the Minnesota and United States Constitutions, Jones has the right to be free from unwarranted searches and seizures, we can only conclude that the inclusion of the statements quoted above was improper.

The alleged misrepresentations are (1) the statement that "The officers asked Mr. Jones to provide a sample of DNA. His wife, Debra Marie Jones, encouraged him to provide a DNA sample but he refused"; and (2) the statement that Jones' alibi could not be corroborated when, in fact, no effort at corroboration had been made. Jones suggests that the statement about his refusal to give a sample was a misrepresentation because there is no discussion about the refusal in the officer's trial testimony. We conclude that this is not a sufficient basis for a claim of misrepresentation and, even if it were, the trial testimony does not reflect this discussion because the court made a pretrial ruling, at the defense's request, that testimony of Jones' refusal would not be admitted at trial. The second alleged misrepresentation—whether the affiant misrepresented that Jones' alibi could not be corroborated—is not a basis for invalidating the warrant because, even if it is a misrepresentation, it is not material. Even if Jones is correct and the affiant should have said his alibi *has not yet been* corroborated instead of his alibi *cannot be* corroborated, it is unlikely that this distinction would have affected the issuing judge's determination. Therefore, we conclude that Jones' argument that the search warrant was defective because it was based on factual misrepresentations lacks merit.

The facts underlying this warrant present a close call as to whether there was a sufficient showing of probable cause. We are wary of a warrant based solely on the testimony of an ex-girlfriend about a conversation that occurred eight years earlier, even though the court determined that Hennen's testimony was bolstered by independent police interviews and Jones' own behavior. We are concerned about the possibility that a suspect's refusal to voluntarily produce his DNA may be used to establish probable cause for a seizure of the evidence. Nevertheless, applying our deferential standard of review leads us to conclude that sufficient probable cause existed to issue the warrant. Therefore, we hold that the court did not abuse its discretion in affirming the issuing judge's finding of probable cause.

## II.

We next address Jones' argument that the district court erred in its pretrial ruling that the DNA test results were admissible. Specifically, Jones makes the following claims: (1) the court erred when it ruled that the state did not have to present evidence proving "general acceptance" of PCR STR testing to satisfy the first prong of the *Frye–Mack* test; (2) the PCR–STR method of DNA testing does not comply with DNA Advisory Board (DAB) standards; (3) in testing his DNA, the BCA did not adhere to its own standards or the standards of the scientific community; (4) the BCA did not adhere to DAB validation and lab accreditation standards; and (5) the BCA's internal validation procedures do not comport with DAB standards.

We recently addressed most of these issues in *State v. Traylor*, 656 N.W.2d 885 (Minn.2003). In *Traylor*, we held that in evaluating a defendant's challenges to the admission of DNA evidence, PCR–STR testing is generally accepted as a method of DNA analysis. *Id.* at 893. As a result, the first prong of the *Frye–Mack* test is no longer at issue. We also held in *Traylor* that the second prong of the *Frye–Mack* test, foundational reliability of PCR–STR testing, was met where the BCA complied with DAB standards, which standards were the appropriate standards currently in effect. *Id.* at 897–98. Accordingly, of Jones' *Frye–Mack* challenges to the DNA test results, the

only remaining claim is that the BCA failed to follow its own standards in the evaluation of the DNA, and therefore the district court erred in finding that foundational reliability had been established.[4]

■ We review district court findings on foundational reliability under an abuse of discretion standard. *Goeb v. Tharaldson*, 615 N.W.2d 800, 815 (Minn.2000). Jones asserts that the following were deviations from the BCA's protocol: (1) when the DNA testing was done, the BCA used a maximum stutter percentage of 20% and since then the BCA has lowered its stutter percentage; (2) after the Jensen tests were completed, the BCA had the ABI 310 machine checked because the runs were taking too long, yet none of the Jensen tests were re-run; (3) the "run folder" in this case is dated 3/10/99 and each sample is typically created 30 minutes apart, yet the dates and times for each of the 14 samples from the Jensen case are listed as having occurred at "10:13 AM" on "7/15/99"; and (4) the vaginal DNA sample was analyzed after it was extracted from a slide by heating the slide over a Bunsen burner and heat can cause DNA to break apart and even degrade. The court found that the alleged testing errors go to the credibility or weight of the evidence to be determined by the jury and do not affect the evidence's admissibility. We will address each of Jones' allegations of BCA testing error in turn.

■ Jones first argues that the BCA has lowered its stutter percentage since it conducted its test on the sample taken from Linda Jensen's body, which change indicates that the initial percentage was unacceptably high. The state asserts that when the BCA lowered its maximum acceptable stutter percentage, it merely refined what was already a valid procedure. The state then points out that Jones presented no evidence that the validity of the results in his case were affected by this change in procedure. Finally, the state asserts that for our court to conclude that tests done using the old stutter percentage are now invalid would act as a disincentive for the BCA to adapt its procedures to increase reliability for fear of invalidating prior testing.

■ Jones' second allegation of error involves the BCA's failure to re-run the tests on the Jensen DNA sample after the ABI 310 machine was repaired to operate at the appropriate EPT voltage. The BCA technician's testimony indicates, however, that the EPT voltage is a mechanism to help evaluate the performance of the machine, not the validity of the sample test results. The technician explained that a constant EPT reading helps technicians confirm that the run is not going too long, which is important because when a run goes too long, the sample may have to be re-run because the printout may not contain the correct number of peaks. While it appears that the EPT reading may, in

4. The concurrence states that "I would conclude that counsel's admission [that the DNA evidence belonged to Jones] and Jones' affirmative testimony preclude his argument that any error in the admission of DNA evidence was prejudicial." We disagree. Jones chose to stipulate to the DNA evidence once the court had ruled that it was admissible. At this point, he may have determined that strategically he was better served stipulating to the evidence and explaining it by taking the stand and testifying to having had an affair with Linda Jensen than he would have been having the state admit the evidence via a BCA technician. However, if the evidence had been excluded, he may have chosen not to testify to having had an affair with Linda Jensen or to testify at all. It is inconsistent with our precedent and with our notion of fairness to conclude that once a defendant chooses to stipulate to evidence he was unsuccessful in getting excluded he has waived the opportunity to argue on appeal that the court erred in admitting the evidence.

some instances, become low enough that re-runs would need to be conducted for some samples, there is no indication in the record that this was the case here.

▮▮▮ Jones' third allegation of error is that the run folder had a "Date Created" date of "7/15/99," but the file was labeled "3/10/99"; and the time of the run for all of the samples was listed as 10:13 a.m., yet the tests could not have been run simultaneously. The BCA technician was unable to explain these mislabelings and stated that he would have to revisit the original run folder on his computer to see why the copy used in the hearing had these discrepancies. However, the technician never concluded, and there is no evidence in the record indicating, that discrepancies in the date and time listings on the run folder made the results of the testing per se inaccurate.

▮▮▮ Jones' fourth allegation of error is that the extraction of the DNA for the testing was done by heating the slide that contained the DNA sample and that testing degrades the sample and leads to incomplete results. The record indicates, however, that the testing was done using DNA material from both the original vaginal swabs and from a slide made from the swabs so that even if incomplete results had been obtained by heating the slide, the DNA sample from the original swabs would not be affected. Further, while Jones presented testimony that heating the sample could result in degradation, in this case the BCA testing of the sample presented interpretable results at all 10 loci tested by the Profiler Plus kit. Accordingly, even if there had been any degradation, these results indicate that the sample was not materially degraded enough to affect the results.[5]

The district court ultimately determined that while Jones had highlighted some potential problems with the BCA's testing procedures, he failed to show that there were any deviations from the BCA's standard testing procedures substantial enough to undermine foundational reliability. Here, the court found that the alleged errors went more to the weight instead of the sufficiency of the DNA evidence. As such, the court found that Jones' challenges to the DNA testing methods could adequately be addressed through cross-examination and rebuttal witnesses. We agree that Jones' challenges are most appropriately characterized as going not to the admissibility of the evidence, but to its weight to be considered by the trier of fact. Moreover, Jones has failed to present any significant evidence that the results in his case were adversely affected by BCA procedures. Accordingly, we hold that the district court did not abuse its discretion in finding the DNA evidence was sufficiently reliable to be admitted.

### III.

▮▮▮ Next, we address Jones' argument that the district court improperly excluded his proffer of alternative perpetrator evidence. The fair opportunity to defend against criminal charges is a right

5. We note that interpretable results were not obtained from the Cofiler kit, something the record fails to adequately explain. Given the testimony indicating that heating a sample can result in degradation of the sample, it is possible that the lack of interpretable results from the Cofiler kit was the result of heating the sample. While the Profiler Plus results allow us to be confident that degradation did not materially affect the results in this case, we do not mean to approve the use of heat to remove the cover slip from a slide in all cases and we note that if a defendant can show that degradation has occurred by showing a lack of interpretable results at several loci, some further investigation of the process may be required.

guaranteed by constitutional due process. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Exclusion of evidence supporting a defendant's theory that an alternative perpetrator committed the crime with which the defendant is charged "will almost invariably be declared unconstitutional when it significantly undermine[s] fundamental elements of the defendant's defense." *Beaty v. Commonwealth*, 125 S.W.3d 196, 2003 WL 22415370 at *7 (Ky.2003) (quoting *United States v. Scheffer*, 523 U.S. 303, 315, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)). Nonetheless, when a defendant seeks to introduce exculpatory evidence based on an alternative perpetrator theory, the court must still evaluate this evidence under the ordinary evidentiary rules as it would any other exculpatory evidence. *See State v. Gutierrez*, 667 N.W.2d 426, 436 (Minn.2003).

■ Alternative perpetrator evidence is admissible if it has an inherent tendency to connect the alternative party with the commission of the crime. *See id.* at 436 n. 8; *see also Beaty*, 125 S.W.3d 196, 2003 WL 22415370 at *7 (stating that alternative perpetrator evidence may be excluded if it could confuse or mislead the jury). Our requirement that such evidence have an inherent tendency to connect the other party with the crime "avoids the use of bare suspicion and safeguards the third person from indiscriminate use of past differences with the deceased." *State v. Richardson*, 670 N.W.2d 267, 280 (Minn. 2003) (quoting *State v. Hawkins*, 260 N.W.2d 150, 159 (Minn.1977)). Once a foundation is laid with evidence having an inherent tendency to connect the alleged alternative perpetrator to the commission of the crime, "it is permissible to introduce evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts which

would tend to prove the third person committed the act," in order to cast a reasonable doubt on the state's case. *Hawkins*, 260 N.W.2d at 159 (internal citations omitted); *see State v. Bock*, 229 Minn. 449, 458–59, 39 N.W.2d 887, 892–93 (1949).

■ It is also permissible for a defendant to present evidence of other crimes, wrongs, or bad acts committed by the alleged alternative perpetrator in order to cast reasonable doubt upon the identification of the defendant as the person who committed the charged crime. *Gutierrez*, 667 N.W.2d at 436–37. We have sometimes labeled this type of proffered alternative perpetrator evidence as "reverse-*Spreigl*" evidence. *Woodruff v. State*, 608 N.W.2d 881, 885 (Minn.2000). Here, *Spreigl* refers to the standard used to determine the admissibility under Minn. R. Evid. 404(b) of evidence of "another crime, wrong, or act," separate from the charged crime. Minn. R. Evid. 404(b); *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965). In order for a defendant to successfully argue for the admission of "reverse-*Spreigl*" alternative perpetrator evidence, he must first meet the threshold requirement of connecting the alternative perpetrator to the commission of the crime with which the defendant is charged. *Woodruff*, 608 N.W.2d at 885. If the defendant fails to meet the threshold requirement of connecting the alternative perpetrator to the charged crime, the reverse-*Spreigl* alternative perpetrator evidence is not admissible. *Hawkins*, 260 N.W.2d at 159. Once the defendant meets that threshold requirement, the district court should then evaluate the admissibility of the reverse-*Spreigl* evidence according to the standard we articulated in *Woodruff*. Under this standard, the defendant must show (1) clear and convincing evidence that the alleged alternative perpetrator participated in the reverse-

*Spreigl* incident;[6] (2) that the reverse-*Spreigl* incident is relevant and material to defendant's case; and (3) that the probative value of the evidence outweighs its potential for unfair prejudice. 608 N.W.2d at 885.

While a proffer of proof concerning an alternative perpetrator may include reverse-*Spreigl*-type evidence, not all evidence concerning an alternative perpetrator is necessarily this type of evidence. Unfortunately, some of the discussion in our decisions has tended to classify all such alternative perpetrator evidence as reverse-*Spreigl* evidence. This classification has perhaps led to the erroneous implication that the heightened clear and convincing standard that is applicable to reverse-*Spreigl* evidence is likewise applicable to all alternative perpetrator evidence. It is not.

Here, Jones sought to introduce evidence about two alternative perpetrators: Robert Beard and Richard Christy. When addressing the admissibility of this evidence, both the parties and the district court failed to distinguish between the proffered alternative perpetrator evidence that was reverse-*Spreigl* evidence and any other proffered alternative perpetrator evidence. Instead, the parties focused their discussion about alternative perpetrator evidence on whether Jones had passed the "clear and convincing" threshold requirement of connecting the alleged alternative

perpetrators to the charged crime. The court then ruled on the issue as the parties presented it and determined that Jones had failed to present "clear and convincing" evidence connecting either Beard or Christy to Linda Jensen's murder. Using this standard, the court deemed that all of Jones' proffered alternative perpetrator evidence was inadmissible.

*Plain Error Analysis*

We conclude that the district court erred when it used the clear and convincing standard to assess the admissibility of all of Jones' proffered alternative perpetrator evidence. More particularly, the court erred when it failed to examine the evidence to determine whether Jones had proffered evidence that was not reverse-*Spreigl* evidence, which evidence should have been evaluated under the ordinary evidentiary rules. Because this error was based on the parties' failure to correctly frame the issue[7] and because neither party objected to this analysis at the district court level or in their briefs to our court, we must analyze the error under the plain error standard. *See State v. Litzau*, 650 N.W.2d 177, 182 (Minn.2002).

Under the plain error review, a defendant may obtain relief if he was denied a fair trial. *Id.* Three factors must be met: (1) there must have been error; (2) that error must be plain; and (3) it must have affected substantial rights.

---

6. *But see Richardson*, 670 N.W.2d at 280 (stating that Sixth Amendment concerns may enter into the picture when it is the defendant who is seeking to present other crimes evidence and that there may well be situations when the clear and convincing rule may have the potential to operate unconstitutionally).

7. The state argued in its "memorandum opposing the use of 'Reverse-*Spreigl*' evidence" that the threshold inquiry of a connection between the alternative perpetrator and the charged crime, as well as the three-pronged

reverse-*Spreigl* test, are appropriately used "to evaluate *any* evidence brought by the defendant to show that a third person committed the crime." As discussed above, this is a misstatement of the law. In discussing whether the evidence about Christy was admissible, defense counsel stated, "We don't have to prove Mr. Christy committed this crime, we just have to show there's clear and convincing evidence to believe that he was involved." This, too, is a misstatement of the law.

*State v. Quick,* 659 N.W.2d 701, 717 (Minn. 2003). If these three factors are met, we may correct the error only if the fairness, integrity, or public reputation of the judicial proceeding is seriously affected. *Id.* In order to conduct a plain error analysis, we must examine Jones' proffered alternative perpetrator evidence with respect to Beard and Christy to determine whether the court erred by classifying all of that evidence as reverse-*Spreigl* evidence and thereby conditioned its admissibility on a heightened "clear and convincing" standard.

*Beard Evidence*

■ The first alternative person about whom Jones offered evidence was Beard. Jones offered the following evidence about Beard: (1) he resembled the sketch of the man the postal carrier claimed to have seen in the Jensens' driveway the morning of the murder; (2) he had called the Jensen home about two weeks before the murder and was upset about his visitation schedule with his son Joseph; (3) he was an early suspect, in part because Charles Jensen stated that Beard could be violent and was the only person he could think of who would kill Linda Jensen; (4) Eddie Mae Crockett, a former girlfriend of Beard's, stated that Beard repeatedly told her he had killed Linda Jensen and had threatened her by saying: "if I [Crockett] ever messed up on him, * * * he'd do the same to me"; (5) statements from Crockett that Beard had described how he had stabbed Linda Jensen in the abdomen, what the wound looked like, that Jensen had been raped, that there had been semen left in her body that was not his, and that there was a baby in the room at the time of the murder. Jones also proffered evidence that (6) Beard acknowledged that he knew where the Jensens lived and had been to the home; (7) no one could verify Beard's alibi for the morning of the mur-

der; and (8) Beard was despondent for a period of time following the murder. In response, the state pointed out that Beard did not live within walking distance of the Jensen home, did not own a car, and his DNA did not match that found at the scene.

In examining this proffered evidence, it becomes clear that, aside from the statement by Charles Jensen that Beard had a history of violence and the statement by Crockett that Beard threatened to kill her like he had Linda Jensen, none of the proffered evidence about Beard could arguably qualify as reverse-*Spreigl* evidence. Accordingly, we conclude that the district court erred when it treated all of the Beard evidence as reverse-*Spreigl* evidence and determined its admissibility under the clear and convincing standard. Moreover, because this evidence was clearly not evidence of prior crimes, wrongs, or bad acts, the court's error was plain error.

■ Having concluded that the district court's error was plain, we must next evaluate whether the court's order excluding the Beard evidence affected Jones' substantial rights. *Quick,* 659 N.W.2d at 717. In order to determine whether substantial rights were affected by the court's erroneous classification of all of the offered testimony with respect to Beard as reverse-*Spreigl* evidence, we must determine whether the evidence would have been admissible had it been properly classified. If the proffered evidence was inadmissible even if it was properly analyzed, then the court's error had no effect, let alone an effect on Jones' substantial rights.

Arguably, if the district court had properly classified Jones' proffered evidence about Beard and then applied the correct standard for admission, most, if not all, of the evidence would have been admitted. The first and second pieces of evidence—

testimony that Beard resembled the sketch and testimony that he had called the Jensen home two weeks before the murder and was upset about the visitation schedule—appear to be admissible. The third piece of evidence, that Beard was an early suspect and that Charles Jensen said Beard was the only person he could think of who would do this, also appears to be admissible, at least in part. The statement about Beard's violent history could arguably be classified as bad act evidence;[8] therefore, the court's classification of this statement as reverse-*Spreigl* evidence may not be plain error. It was, however, plain error to classify as reverse-*Spreigl* evidence the separate statement by Charles Jensen that Beard is the only one he could think of who would kill Linda Jensen.

The fourth and fifth pieces of evidence—Crockett's statements—are arguably the strongest pieces of evidence offered against Beard, but may be the most likely evidence to have been excluded on ordinary evidentiary grounds even if the district court had not excluded it as reverse-*Spreigl* evidence. The state argues that even if it the court had used the correct legal analysis, it still would have excluded Crockett's statements and the other proffered evidence about Beard as hearsay. But reaching such a conclusion requires us to speculate about what the court would have done had it not ruled the evidence inadmissible on erroneous grounds. Moreover, such speculation would deprive Jones of any opportunity to provide foundation evidence or even to argue against exclusion of the Crockett statements as hear-

say. Therefore, we are unable to conclude on this record that Crockett's statements were inadmissible had they been properly analyzed.

The ability of a defendant to present exculpatory evidence—evidence tending to establish the defendant's innocence—is fundamental to our system of justice. *See California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (stating that "fundamental fairness * * * require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense."). Here, if the Crockett statements together with the other Beard alternative perpetrator evidence were admissible, exclusion of this evidence denied Jones the right to present exculpatory evidence to the jury. Therefore, we conclude that the district court's error in analyzing the Beard evidence affected Jones' substantial rights.

*Christy Evidence*

 Christy was the second person about whom Jones proffered alternative perpetrator evidence. Jones offered the following evidence about Christy: (1) he apparently had met Linda Jensen at a gym; (2) he was identified as resembling the postal carrier's sketch; (3) he was considered an early suspect by the police; (4) Drahota made statements to the police that a third person named Chandler, who had since died, told Drahota in a series of conversations many incriminating things that Christy had done and said, including statements and acts that could connect Christy to Linda Jensen's murder; (5) Drahota stated that he had been at Chan-

---

**8.** This statement may also have qualified as hearsay on reputation as to character under Minn. R. Evid. 803(21), but in order for this type of evidence to be admitted, it is subject to other rules of evidence by which admissibility is generally governed by the *Spreigl–Billstrom* rules. *See State v. Forsman,* 260 N.W.2d 160, 168 (Minn.1977) (citing *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965), and *State v. Billstrom,* 276 Minn. 174, 149 N.W.2d 281 (1967)). Accordingly, we do not conclude that exclusion of this statement as reverse-*Spreigl* evidence was plain error.

dler's home on what he believed may have been the day of Linda Jensen's murder, and Christy arrived with blood on his hands and jacket and that Chandler and Christy later left with towels and garbage bags with the apparent goal of cleaning up a crime scene; and (6) statements by another woman that Christy had visited her home and told her that he had been at the Jensen home the morning of the murder waiting in a truck while an accomplice went in to rob the house. In response, the state pointed out that Christy's DNA was tested and did not match that found at the scene.

As with the evidence about Beard, we conclude that the first and second pieces of evidence about Christy—that he resembled the sketch and that he was an early suspect—may have been admissible if the correct evidentiary standard had been used. Similarly, Drahota's statements about what he witnessed firsthand—that Christy arrived at Chandler's garage with blood on his hands and jacket, that Chandler, Christy, and Drahota then collected new towels and garbage bags and shovels, with which Christy and Chandler later left—may have been admissible as long as the district court determined that these statements were sufficiently relevant.

The admissibility of Drahota's statements about Chandler's hearsay statements is less certain. Some of what Drahota discussed was ordinary hearsay, i.e., statements of Chandler to Drahota that implicate Christy; and some was double hearsay, i.e., statements Christy allegedly made to Chandler that Chandler repeated to Drahota. Accordingly, for the district court to admit the double hearsay statements Chandler made to Drahota discussing statements Christy made to Chandler, there would have to be a hearsay exception that would allow admission of Christy's statements and a hearsay exception that allows admission of Chandler's statements.

Here, it is important to note that the district court analyzed these hearsay statements to determine if they were admissible under the catchall exception to the rule against hearsay of unavailable witnesses, Minn. R. Evid. 804(b)(5).[9] Relying on the contradictions within Drahota's own statements to investigators and the contradictory testimony of others like Chandler's wife and son, the court appeared unconvinced that Drahota's recounting of Chandler's alleged statements was reliable. The court further noted that there was no corroboration for any of Drahota's recollections of Chandler's statements.

Lastly, we address the fifth piece of evidence offered about Christy, the statement by another woman that Christy had visited her home and told her that he had been at the Jensen home the morning of the murder waiting in a truck while an accomplice went in to rob the house. The court should have analyzed this evidence under ordinary evidentiary rules as hearsay, but erroneously treated it as reverse-*Spreigl* evidence. Accordingly, we must decide whether the exclusion of the woman's statement, as well as the exclusion of

---

9. Minnesota Rule of Evidence 804(b)(5) makes admissible hearsay statements of unavailable witnesses fitting the following description:

 A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
 Minn. R. Evid. 804(b)(5).

the other Christy evidence, affected Jones' substantial rights.

The problem is similar to the problem we faced with respect to the Beard evidence. The district court did not use the correct evidentiary standard. We can only speculate about what foundation evidence Jones would have presented if he had not been precluded from exploring this evidence, how Christy would have responded if called to testify, and what the court would have done under any of several possible scenarios. Therefore, for reasons similar to those used in our analysis of the Beard alternative perpetrator evidence, we are unable to conclude that if properly analyzed the Christy evidence would necessarily have been excluded. If the Christy evidence was admissible, then Jones was denied the right to present exculpatory evidence to the jury that could cast reasonable doubt on the state's case and his constitutional rights were affected.

*Fairness, Integrity, and Public Reputation of Jones' Trial*

Having concluded that Jones' substantial rights were affected when the Beard and Christy alternative perpetrator evidence was improperly excluded, we must next address the final consideration of the plain error analysis—was the fairness, integrity, or public reputation of the judicial proceeding (Jones' trial) seriously affected? The answer to this question is a close call. Here, we are particularly concerned with the generality of Jones' proffer of proof. Defense counsel are well-advised to make the most specific offer possible, even to the point of stating that witness X will testify as follows and witness Y will testify as follows. Further, defense counsel must be prepared to demonstrate that the prof-

fered testimony is actually available and not offer more than can actually be proven. Here, the district court did not base its decisions to exclude the evidence on deficiencies in the form of Jones' offer of the proof, but instead used an erroneous legal standard. The error was plain and substantially affected Jones' rights to a fair trial. For us to speculate that the evidence would have been excluded had the correct standard been used would deny Jones the ability to argue against its exclusion using the correct standard. An even greater problem here is that we are forced to speculate on the ability of a defendant to present exculpatory evidence, which goes to the core of our constitutional protections for a defendant. Therefore, we conclude that the inability of Jones to address the exclusion of the Beard and Christy evidence in the context of the correct legal standard seriously affected the fairness and integrity of his trial. Accordingly, under our plain error analysis, we must hold that Jones' conviction be reversed and that he is entitled to a new trial.

## IV.

Jones also argues that the district court erred in ordering that he wear a leg restraint during his trial. It is not necessary to address this issue in light of our holding that Jones' conviction should be reversed on other grounds. Further, Jones admits that even if we determine that it was error to order that he wear a leg restraint, the error was harmless because the jury never saw the restraint. Nevertheless, Jones asks that we address this issue to prevent further discretionary abuse by district courts [10] and we choose to do so for that reason.

---

10. We have recently seen other evidence that Jones' concern is merited in another case in which the district court ordered the defendant

to wear an inconspicuous leg brace, citing no reason other than the defendant's age and the severity of the charged crime. *State v. Hous-*

■■ The decision to require a defendant to wear restraints during trial is within the discretion of the district court and will not be overturned absent an abuse of discretion. *State v. Chambers*, 589 N.W.2d 466, 475 (Minn.1999). But we have previously recognized that because of the prejudice involved in having the defendant restrained, to be constitutionally permissible the restraint must be "justified by an essential state interest specific to each trial." *State v. Shoen*, 578 N.W.2d 708, 713 (Minn. 1998) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)).

■■ Minnesota Rules of Criminal Procedure 26.03, subd 2(c), dictates that restraints will not be used "unless the trial judge has found such restraint reasonably necessary to maintain order or security. A trial judge who orders such restraint shall state the reasons on the record outside the presence of the jury." The nonexclusive list of factors to be considered in making the decision of whether to restrain the defendant include the following:

(1) the seriousness of the charge; (2) the defendant's temperament and character; (3) the defendant's age and physical attributes; (4) the defendant's past record; (5) the defendant's prior escapes or attempted escapes; (6) threats made by the defendant to cause a disturbance; (7) the size and mood of the audience; (8) the nature and security of the courtroom; and (9) any less restrictive available alternatives.

*Chambers*, 589 N.W.2d at 475.

Here, the district court held a hearing outside the presence of the jury and made findings on the record as to why it ordered the restraint. The findings for why the restraint was ordered, however, are reminiscent of the findings we deemed insufficient in *Shoen:* the serious nature of the charges, the presumptive sentence of life in prison, and that this was the least restrictive means available. In *Shoen*, we stated that restraining the defendant was not objectively reasonable where the reasons offered for the restraint were that "[the defendant] had been charged with first-degree murder, * * * that the restraint itself was the most innocuous type of restraint available," and that the jury would not know about it. *Shoen*, 578 N.W.2d at 715. Relying only on the seriousness of the charged crime and the inconspicuous nature of the restraint is no more objectively reasonable today than it was when we articulated the rule in *Shoen.* To hold otherwise would be to encourage courts to order restraints for all defendants charged with serious crimes. While the severity of the offense is an acceptable factor to be considered, it cannot be the only factor. *Id.* Accordingly, we hold that the court erred in ordering that Jones be restrained during his trial.

V.

■■ We next address the last error that Jones raised through his counsel. Jones alleges that there was prosecutorial misconduct during his trial, an allegation he makes for the first time on appeal. A defendant usually waives his right to raise the issue of prosecutorial misconduct on appeal when he fails to object or to seek a curative instruction at trial. *State v. Torres*, 632 N.W.2d, 609, 617–18 (Minn.2001). Relief will be granted in the absence of a timely objection only in cases involving "unduly prejudicial" prosecutorial misconduct. *State v. Whittaker*, 568 N.W.2d 440,

*ton*, No. C5–02–584, 2002 WL 31892561 (Minn.App., Dec.31, 2002), *rev. denied* (Minn.

March 18, 2003).

450 (Minn.1997). Having already concluded that Jones is entitled to a new trial because the district court erred in failing to admit alternative perpetrator evidence, it is not necessary to address Jones' prosecutorial misconduct allegations in detail. We do note, however, that Jones' allegations of prosecutorial misconduct either lack merit or do not constitute the type of unduly prejudicial conduct that warrants relief in the absence of a timely objection. *See id.*

## VI.

In addition to the arguments presented through counsel, Jones made eleven allegations of error in a pro se brief. Jones alleged the following: (1) he was harassed by police; (2) the state was delinquent in turning over discovery items; (3) Anderson lied about having had a deal with the state in exchange for his testimony; (4) Anderson was coached while on the witness stand; (5) there were inconsistencies in the medical examiner's testimony; (6) there was insufficient forensic evidence to support his conviction; (7) the district court erred in denying his requests for a change of venue; (8) the court erred in allowing two witnesses to violate a court order mandating that witnesses not refer to the victim by her first name; (9) the court erred in not admitting a letter Jones wrote about Anderson; (10) a prior conviction of a state witness was not revealed to the defense; and (11) he received ineffective assistance of trial counsel. We have considered each of Jones' pro se arguments and, after a thorough review of the record and case law relevant to these arguments, we conclude that none of these claims has merit.

## VII.

Finally, we address the district court's denial of Sandra Halverson's, the victim's sister, request for restitution. We address this issue because it is possible that it will recur as the result of a retrial. This appeal can be classified as a state appeal from a sentence in a first-degree murder case, over which we have inherent jurisdiction. *See State v. Warren,* 592 N.W.2d 440, 451 (Minn.1999). The district court determined that it did not have jurisdiction to award restitution because Minn. Stat. § 611A.01 does not include a murder victim's sister in the class of eligible victims. *See* Minn.Stat. § 611A.01 (2002). Issues involving the authority and jurisdiction of the district court are legal issues, which we review de novo. *State v. Pflepsen,* 590 N.W.2d 759, 763 (Minn.1999). Statutory construction is also a matter of law that we review de novo. *Sorenson v. St. Paul Ramsey Med. Ctr.,* 457 N.W.2d 188, 190 (Minn.1990).

The restitution statute defines the "victim," or the party eligible to receive restitution, as "a natural person who incurs loss or harm as a result of a crime * * *. If the victim is a natural person and is deceased, 'victim' means the deceased's surviving spouse or next of kin." Minn.Stat. § 611A.01(b) (2002). Here, the district court first determined that, in a homicide case, the victim is deceased; therefore, the restitution can be requested only by the surviving spouse or next of kin of the deceased victim.

The state argues that a more general definition of victim, i.e., someone who "incurs a loss or harm," applies here and the district court erred in applying the "deceased" provision to limit the number of victims. The state asserts that the "if the victim * * * is deceased" provision is not meant to limit the number of victims eligible to receive restitution; rather, its purpose is to preserve restitution claims for crime victims who, for some reason unrelated to the crime, die before they are

able to collect restitution. While the state is correct that the plain meaning of the statute permits a victim's claim to be preserved even if she dies for reasons unrelated to the crime, this result does not explain how to define the "victim[s]" whose claims are preserved. Moreover, we conclude that the state's general definition is problematic.

One problem with the state's expansive definition of "victim" is illustrated when we substitute the state's definition into the other uses of the word victim in the restitution statutory scheme. For example, Minn.Stat. § 611A.03, subd. 1 (2002), requires that the state "make a reasonable and good faith effort to inform the victim" of any plea agreements. The state's definition of victim would render this provision unduly burdensome because the "victim" would include not just the direct victim of the crime but also all those who have "incur[red] a loss," including, apparently, that victim's family members and perhaps friends. Every crime resonates within its community and may create innumerable victims, from the person against whom the crime was perpetrated to the unknown neighbor whose feelings of security are undermined. These persons may have incurred some identifiable loss, but certainly the legislature cannot have intended the absurd result of forcing the state to make all such victims aware of every plea agreement it enters into.

The legislature must instead have envisioned that victim in Minn.Stat. § 611A.01(b) be defined as "a natural person who incurs loss or harm as a [direct] result of a crime." Accordingly, the court of appeals has adopted a similarly narrow interpretation of victim in the restitution context. "This court has explained that the definition of victim in the restitution statute is narrower than other statutory definitions of victim. '[W]hile restitution covers a broader range of damages, it is limited to a narrower range of crime victims.'" *In re Welfare of J.A.D.*, 603 N.W.2d 844, 846 (Minn.App.1999) (quoting *State v. Dendy*, 520 N.W.2d 411, 413 (Minn.App.1994)).

A narrow interpretation of the term victim is also consistent with other sections of the crime victims' rights statutory scheme to which the Minn.Stat. § 611A.01 definition for victim is to be applied. Minnesota Statutes § 611A.038 (2002) gives victims the right to submit impact statements at sentencing. It also provides that "[a] representative of the community affected by the crime may submit an impact statement in the same manner that a victim may[,] * * * [which] shall describe the adverse social or economic effects the offense has had on persons residing and businesses operating in the community." Minn.Stat. § 611A.038(b). If the term victim encompassed all those who suffered a loss or harm as a result of the crime instead of just the direct victim of the crime, this section would be redundant.

Similarly, under Minn.Stat. § 611A.039 (2002), which establishes the right to notice of a final disposition of a criminal case, the state is required to give such notice in cases "in which there is an identifiable crime victim." It is not clear how such a victim would be "identifiable" unless it is because he or she was the direct victim of the crime. Finally, under Minn.Stat. § 611A.0395(a) (2002), the state is required to give the victim certain information in a notice of the defendant's appeal, including "a statement that the victim and the victim's family may attend the argument or hearing." If the term victim was intended to encompass the direct victim's family in its definition, the phrase "the victim and the victim's family" would be redundant.

Support for our interpretation of victim under Minn.Stat. § 611A.01 can also be

found in the way the legislature used the term victim in describing a defendant's potential obligations when ordered to pay restitution. The statute includes the clause "payment of compensation to the victim or the victim's family." Minn.Stat. §§ 609.10, subd. 2(a)(1) (2002); 609.125, subd. 2(a)(1) (2002). Thus, in looking at both the statutory provisions addressing victims' rights and those defining restitution obligations, we conclude the better interpretation of the term "victim" is that of the direct victim of the crime. In this case, however, the victim died as a result of the crime, as is always the case in a murder, and the district court then correctly looked at the "If the victim * * * is deceased" provision and noted that "victim" now "means the deceased's surviving spouse or next of kin." Minn.Stat. § 611A.01(b).

The state also argues that even if we adopt the district court's narrower interpretation of victim to mean "surviving spouse or next of kin," a sister qualifies as next of kin and should be able to request restitution. Here, the district court appears to have determined that when the decedent has both a surviving spouse and next of kin, the "or" means that the "next of kin" can only claim restitution if there is no "surviving spouse." The court offered no explanation for how it reached its determination, but it presumably read the disjunctive "or" to mean "surviving spouse or [if there is none] next of kin." Apparently relying on the fact that Linda Jensen had a surviving spouse, the court determined that her sister could not recover, even though her surviving spouse never sought restitution.

We conclude that the district court's interpretation of the disjunctive "or" contradicts the plain language of the statute. We construe the language to mean that the surviving spouse and next of kin can-

not both recover, but it does not mean that the next of kin should be precluded from recovering when the surviving spouse does not seek restitution. Accordingly, if Halverson qualifies as a "next of kin," she may be permitted to seek restitution because Jensen's surviving spouse apparently chose not to do so.

To determine whether Halverson qualifies as "next of kin" under the statute requires that we define this term in the context of restitution. In support of its position that a victim's sister is entitled to restitution, the state cites to the wrongful death context, where " 'next of kin' means blood relatives who are members of the class from which beneficiaries are chosen under the intestacy statute." *Wynkoop v. Carpenter*, 574 N.W.2d 422, 427 (Minn. 1998). The state argues this definition is appropriate for restitution as well because one of the claims that can support a wrongful death action is an intentional murder, the act for which Halverson is seeking compensation. It is not clear, however, that the class of persons who qualify as restitution victims and those persons who are potential plaintiffs in a wrongful death action are sufficiently similar to borrow the definition of next of kin from the wrongful death context. More specifically, the "next of kin" who are restitution "victim[s]" under the statute appear to be only the persons who step into the shoes of the deceased direct victim of the crime, while the "next of kin" who are potential plaintiffs in a wrongful death action are the indirect victims of the crime.

As the district court noted, the wrongful death statute differs from the restitution statute because it allows recovery for an unlimited number of persons as long as they are members of the group of "spouse and next of kin." We conclude that the disjunctive use of the word "or" in the restitution statute suggests that only one

person or class of persons is meant to be able to apply for restitution, so the term "next of kin" should be so defined. Thus, the "next of kin" who can recover under the restitution statute are more narrowly defined than those next of kin who are potential plaintiffs in a wrongful death action. Using the common law definition of "next of kin"—the nearest living blood relation—accomplishes this result. *See Watson v. St. Paul City Ry. Co.*, 70 Minn. 514, 517, 73 N.W. 400, 401 (1897). Hence, we conclude that the common law definition of "next of kin" is the appropriate definition to use in the restitution context.

■■■ Therefore, we hold that in a murder case the "victim[s]" eligible to receive restitution include either the murder victim's surviving spouse or her nearest living blood relation. As Linda Jensen's sister, Halverson cannot take under this definition because the record indicates that Linda Jensen's children are still living and they are in the class of persons who are her nearest living blood relatives who would qualify for restitution as her next of kin. Accordingly, we hold that the district court did not err in denying Halverson's request for restitution.

Reversed.

HANSON, Justice (concurring).

I concur in the result but write separately to express the view that the court's determination of some of the DNA issues is unnecessary and may have unintended ramifications for other cases.

The issues concerning DNA evidence are raised in an unusual procedural posture because Jones' counsel, in the opening statement, admitted that the semen found in the vaginal swab from Linda Jensen was that of Jones. Later, Jones testified that he had been having an affair with Jensen and explained that the presence of his semen in Jensen was the result of consen-

sual sex the afternoon before the murder. I would conclude that counsel's admission and Jones' affirmative testimony preclude his argument that any error in the admission of DNA evidence was prejudicial.

It is true that a defendant's stipulation to the admissibility of evidence he was unsuccessful in suppressing does not generally constitute a waiver of the opportunity to argue that evidentiary issue on appeal. But Jones did not actually stipulate to the admissibility of the DNA evidence. Instead, he waived his Fifth Amendment right to not testify and provided affirmative testimony of a relationship with Jensen and a sexual episode that explained the presence of his semen. In so doing, Jones did not waive his right to argue that the DNA evidence should have been excluded, but he did waive his Fifth Amendment rights and his testimony rendered the DNA evidence moot. Jones may argue that he only waived his Fifth Amendment rights because of the court's ruling on the DNA evidence, but I am not aware of any case law that would allow a defendant, after a failed attempt to suppress evidence, to make a conditional waiver of his Fifth Amendment rights, testify to his version of the facts, and then seek to reinstate his Fifth Amendment rights if the attempt to suppress evidence is successful on appeal.

Accordingly, I would not decide the specific challenges to the DNA evidence, but would reserve them for another day when we are presented with a better record, where defense counsel is motivated to cross-examine the state's expert witnesses with greater intensity, and where the admission of the DNA results had a significant effect on the jury's verdict.

Two of the challenges to the DNA evidence are particularly troubling because of the poorly developed record before us.

First, the district court limited the *Frye–Mack* hearing to the second prong of foundational reliability, and the majority concurs in that limitation, because the first prong (general acceptance in the scientific community) was approved for PCR–STR testing in *State v. Traylor*, 656 N.W.2d 885, 891–93 (Minn.2003). But *Traylor* also discussed due process concerns that might prevent the admission of DNA evidence because of the refusal of the manufacturer of the DNA testing kits to provide access to the primer sequences and validation studies that underlie those kits. *Id.* at 898–900. In rejecting Traylor's constitutional argument, we relied on the existence of certain facts in the *Traylor* record that safeguarded against undue prejudice to Traylor. *Id.* at 900.

For example, *Traylor* noted that samples of the questioned DNA remained after testing by the state that made it possible for Traylor to conduct independent tests to verify the accuracy of the state's results. *Id.* We said: "Finally, and importantly, there was a portion of the DNA sample at issue available for Traylor to perform his own tests, an opportunity Traylor did not pursue." *Id.* The record before us reveals that some of the vaginal sample taken from Linda Jensen was exhausted by testing in 1992 (using the Restricted Fragment Length Polymorphism method) and the balance of the sample appears to have been exhausted by PCR STR testing in 1999.

Further, *Traylor* presented a situation where the PCR–STR testing consisted of two parts, the Profiler Plus kit and the Cofiler kit. *Id.* at 890. The Profiler Plus kit typically examines 10 loci and the Cofiler kit typically examines 3 additional loci. Here, the BCA could not get any interpretable results from the Cofiler kit, for reasons that are not fully explained in the record. Thus, the state's expert based his opinions on the results of 10 loci, not the 13 normally present in PCR–STR testing. Jones does not present a due process argument here. But, because we do not need to do so, I would not treat *Traylor* as having judicially precluded due process challenges for all PCR STR testing.

Second, at least one significant issue was presented concerning the *Frye–Mack* second prong of foundational reliability, involving the use of a Bunsen burner to heat the smear slide to loosen the mounting media by which the cover slip was adhered. Jones argues that this procedure is not an approved protocol and its reliability has not been confirmed by validation studies. The BCA expert, James Iverson, testified only that he had successfully used this process one other time and did not address whether separate validation is required by DAB standards.

Perhaps this issue was made moot by the ability of the BCA to present interpretable results at all 10 loci examined by the Profiler Plus kit. The testimony was that heat could only degrade the sample, not change it, and it could be argued that obtaining interpretable results at all 10 loci shows that the sample was not materially degraded. But we are left with the mystery of the Cofiler kit. Was the inability to get interpretable results from that kit due in some measure to degradation of the sample as the result of heat? Absent a clear answer to that question, I would not read this decision as approving the use of Bunsen burner heat to remove a cover slip from a slide or to extract a sample from a slide. Where greater degradation has been shown, as evidenced by the inability to produce interpretable results at a significant number of loci, some further validation of the process in a prong two *Frye–Mack* hearing may well be required.

MEYER, J. (concurring).

I join in the concurrence of Justice Sam Hanson.

PAGE, J. (concurring in part).

I join in part the concurrence of Justice Sam Hanson.

PAGE, Justice (concurring in part, dissenting in part).

Except to the extent that I agree with Justice Hanson that we should not decide the specific challenges to the DNA evidence, leaving them for another day when we are presented with a better record, I concur in the result reached by the court in parts I and III through VI of the opinion. I respectfully dissent with respect to part VII. The court's reading of Minn.Stat. § 611A.01(b) is too narrow. "Restitution is primarily intended to compensate a crime victim for his or her loss by restoring the victim to his or her original financial condition." *State v. Terpstra,* 546 N.W.2d 280, 283 (Minn.1996). In other words, the restitution statute is a remedial statute. "It is elementary that remedial statutes must be liberally construed for the purpose of accomplishing their objects." *State v. Indus. Tool & Die Works,* 220 Minn. 591, 604, 21 N.W.2d 31, 38 (1945). Section 611A.01(b) provides that: "If the victim is a natural person and is deceased, 'victim' means the deceased's surviving spouse or next of kin." The court reads the terms "surviving spouse" and "next of kin" as mutually exclusive.[1] Reading the statute in this manner, however, contradicts our canons of statutory construction, ignores reality, and produces absurd results.

The construction of section 611A.01(b) that is most consistent with the object of compensating crime victims for their losses resulting from the crime is to read the word "or" between the terms "surviving spouse" and "next of kin" inclusively. This interpretation would allow the surviving spouse or any next of kin who has suffered any out-of-pocket loss as a result of the crime to receive restitution. It makes sense to read the statute in this manner because the deceased's spouse is not the only one who may suffer an out-of-pocket loss as a result of the crime. Any one or combination of the following persons may suffer such a loss: spouse, parent, child, or sibling. For example, if the deceased's spouse does not have the wherewithal to pay the deceased's final medical or funeral expenses, some of those expenses may be borne by the deceased's parents, siblings, or children. Although this example is hypothetical, the reality is that such an occurrence would not be at all unusual for the impoverished crime victim. Yet under the court's reading of the restitution statute, only the spouse would be entitled to restitution and only for that portion of the expenses he or she paid. Thus, if those expenses totaled $2,500 and the spouse contributed $500 and the deceased's parents, siblings, and children paid the remainder, the spouse would be entitled to restitution for his or her $500 and the remainder could not be recovered. This is an absurd result,[2] which I do not believe the legislature intended. It is even more absurd when the fact that the perpetrator of the crime is relieved of the obligation to provide full restitution is considered.

---

1. The court reads the legislature's use of the word "or," which separates the terms "surviving spouse" and "next of kin" as either surviving spouse or next of kin, but not both. While that is one way to read the word "or," it is not the only way. The word "or" may also properly be used inclusively. Bryan A.

Garner, *A Dictionary of Modern Legal Usage,* 624 (2d ed.).

2. One need not have an overactive imagination to think of other examples that would produce equally absurd results.

Clearly, the court's reading of Minn.Stat. § 611A.01(b) undermines the statute's remedial nature and frustrates its purpose.

I also believe that the court's narrow definition of "next of kin" undermines the purpose of the restitution statute. Under the court's interpretation, if the deceased left a surviving spouse, children, and siblings, and the siblings paid for the deceased's funeral, the siblings would not be the deceased's nearest blood relatives and therefore would not be entitled to restitution even if the spouse did not seek restitution. Again, this strikes me as an absurd result made even more absurd by the fact that the person who caused the deceased's death would be freed from any obligation to pay restitution. Thus, I would apply the definition of "next of kin" utilized in wrongful death actions and allow "blood relatives who are members of the class from which beneficiaries are chosen under the intestacy statute" to seek restitution. *Wynkoop v. Carpenter*, 574 N.W.2d 422, 427 (Minn.1998). In that one of the purposes of allowing crime victims to receive restitution is to free the victim "from the burden of instituting a civil action based upon the same conduct," *Terpstra*, 546 N.W.2d at 283, it only seems logical to apply the definition of "next of kin" used in wrongful death actions.

Accordingly, I would hold that Linda Jensen's sister, Sandra Halverson, is a member of the class of persons who are entitled to restitution under the statute.[3]

---

3. It is unclear from the record whether the expenses for which Halverson seeks restitution are the type that are recoverable under the restitution statute. Therefore, I question whether the court should consider the issue of whether Halverson is a member of the class of individuals who may seek restitution. That issue is not central to the resolution of this case and the issue would be moot on retrial if Jones is acquitted or the trial court determines that Halverson's expenses are not of the type for which restitution may be sought.